THERESA CLINTON, Adm'r of the Estate of Robert E. Clinton, Deceased, Plaintiff-Appellant, *v.* COMMONWEALTH EDISON COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 59370

Opinion filed March 15, 1976.

Edward M. Burke & Associates, P.C., of Chicago (Michael T. Healy, of counsel), for appellant.

O'Brien, Kerpec & Evans, of Chicago (Donald J. O'Brien, Jr., Richard M. O'Brien, and Dom J. Rizzi, of counsel), for appellee Commonwealth Edison Company.

Peter Fitzpatrick, of Chicago, for appellee Paul Hassel.

Mr. JUSTICE BURKE delivered the opinion of the court:

Robert Clinton, 15 years old, was found electrocuted in the yard of his family's residence on April 27, 1968. His mother, Theresa Clinton, as administrator, filed a complaint charging negligence against Commonwealth Edison Company (Edison) and Paul Hassel, d/b/a Spark Electric, alleging that Robert Clinton's death was caused by defendants' failure to insulate the electrical wires over the Clintons' property, to position the transformer properly, and to warn of the danger of the uninsulated wire.

At the close of all the evidence, the court granted defendants' motions for directed verdicts. Plaintiff contends that the evidence was sufficient to show factual questions of negligence and the lack of contributory negligence which should have been decided by the jury.

On March 3, 1959, James Clinton, the deceased's father, employed Paul Hassel to install poles and electric lines for electric service to the Clintons'

new home. Hassel followed the diagram provided by Edison for the installation of the pole line construction. He placed three wooden poles on the Clintons' property and strung bare copper wire from pole to pole. The transformer which he received from Edison was placed on the pole closest to the house, as indicated on the diagram. Hassel sold the wire and poles to James Clinton; the transformer remained the property of Edison.

The first pole was placed about 100 feet from Edison's power transmission line on Stony Island Avenue. The second pole was in the middle of the 300-foot expanse between the first to third poles. The third pole was 50 to 60 feet from the house. The wire on the poles was at the height of about 22½ feet and was clearly visible from the ground.

Edison connected wires from its transmission line to the first pole on the Clintons' property. The primary wire across the poles carried 7200 volts of electrical current. The secondary wire extending from the transformer on the pole closest to the house carried 220 volts.

On April 27, 1968, the Clintons' neighbor first observed Robert Clinton cutting the grass around his home at about 9:30 a.m. At 1 p.m. his body was discovered lying in the yard. The cause of death was cardiac arrest due to electrocution. A 25-foot aluminum pole, part of a dismantled citizen's band radio antenna, was discovered near the body. There were burn marks on the pole, approximately six to seven feet from the top. The primary wire spanning the poles on the Clintons' property also had burn marks.

Hassel testified that James Clinton told him where to place the poles. Hassel also said that he explained the installation of the line and showed Clinton the uninsulated copper wire that he would use. In addition he told Clinton that the wire carried 7200 volts. James Clinton denied that he told Hassel where to put the poles. He maintained that Hassel did not discuss the 7200-volt line with him. The bill for the installation which Clinton's wife paid showed that the line carried 7200 volts.

Hassel also testified that a 7200-volt wire could not be insulated and that bare copper wire was the only type ever installed. Phillip Harris, a consulting electrical engineer who was the plaintiff's expert witness, testified that adequate insulation to protect against shock was available for a 7200-volt line at the time it was installed on the Clintons' property. On cross-examination Harris stated that as a practical matter he would regard even an insulated wire as dangerous since there is always a chance of electrocution.

Casper Hemeroa, an engineer for Edison, testified that the specifications on the diagram provided by his company for the pole line installation on the Clintons' property indicated the size of wire to be used, not the type. Hemeroa stated that the type of wire was usually determined by the

customer or the installer. Paul Hassel testified that the type of wire specified on Edison's diagram was an uninsulated copper wire.

Hassel testified that it was necessary to install the transformer close to the Clintons' house, as indicated on Edison's diagram, in order to provide proper service. He said that if the transformer was placed farther away from the house, a greater voltage drop, caused by the greater distance the electrical current must travel on the smaller wire, would produce flickering lights and other disruptions in the service.

Edison replaced the Clintons' 5 K.V.A. transformers with a 10 K.V.A. transformer in 1969 after James Clinton complained about flickering lights. This was after Robert's death. The larger transformer increased the amount of power that it could safely handle but did not change the voltage. James Clinton testified that after the transformer was changed the lights continued to flicker until the time he testified.

Phillip Harris, plaintiff's expert witness, testified that if a 10 K.V.A. transformer were placed on the pole locateded ed on the Clintons' property closest to the road, it would be possible to go a distance of 400 to 500 feet with only a small voltage drop, thereby maintaining adequate service, by increasing the size of the wire. The placement of the transformer on the first pole would result in having a 240-volt secondary line spanning the Clintons' property instead of the 7200-volt line.

On cross-examination, Harris stated that a 240-volt line under certain conditions was capable of causing death. Harris also testified that if the house lights flickered where a 10 K.V.A. transformer was only 50 to 60 feet from the house, a very great voltage drop was indicated which possibly precluded moving the transformer farther away from the house. He said that if the transformer was placed on the pole closest to the road, an insulated wire 400 feet long could possibly weigh over 500 pounds; an uninsulated 7200-volt wire extending the same distance would weigh about 40 pounds. Harris further stated on cross-examination that the Illinois Commerce Commission's regulations required that overhead power lines be placed a minimum of 18 feet over private property; and there was no requirement that the wires be insulated.

■■ In considering whether a directed verdict was proper, the *Pedrick* rule requires the reviewing court to determine whether all the evidence, viewed in its aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504.) A plaintiff is entitled to recover only by proving each element of a negligence action; the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. (*Neering v. Illinois Central R.R. Co.*, 383 Ill. 366,

50 N.E.2d 497.) A plaintiff's failure to prove any one of the necessary elements authorizes a directed verdict for the defendant. *May v. Illinois Power Co.,* 342 Ill. App. 370, 96 N.E.2d 631.

Plaintiff sets forth two acts which she claims constitute negligence by the defendants. First, plaintiff alleges that defendants negligently installed an uninsulated 7200-volt line which spanned the Clintons' property; thus, defendants failed in their duty to protect plaintiff's intestate and others who might foreseeably come into contact with the high voltage wire.

■■  The determination of the existence of a legal duty is a question of law to be determined by the trial court. (*Barnes v. Washington,* 56 Ill. 2d 22, 305 N.E.2d 535; *Lorang v. Heinz,* 108 Ill. App. 2d 451, 248 N.E.2d 785.) In order for a legal duty to exist upon which to predicate liability, the occurrence must be reasonably foreseeable. "Harper and James, in their Law of Torts, observe: 'Not what actually happened, but what the reasonably prudent person *would then have foreseen as likely to happen,* is the key to the question of reasonableness.' (2 Law of Torts (1956), sec. 16.9, at 929.)" *Cunis v. Brennan,* 56 Ill. 2d 372, 376, 308 N.E.2d 617.

■■  Electricity is an inherently dangerous and deadly force which should be regarded with a high degree of care by those engaged in the business of supplying electrical energy. (*McGill v. Illinois Power Co.,* 18 Ill. 2d 242, 163 N.E.2d 454.) But the high degree of care required does not necessitate the insulation of all electrical wires:

> "Persons handling electricity must protect the public against danger by the proper insulation of its wires where the public is likely to come in contact with them. But this duty does not extend to the entire system. *Persons engaged in the transmission of electricity are not insurers of the safety of the public   *   *   *.*" (Emphasis added.) *Austin v. Public Service Co.,* 299 Ill. 112, 119, 132 N.E. 458. See also *Merlo v. Public Service Co.,* 381 Ill. 300, 313, 45 N.E.2d 665.

The evidence most favorable to the plaintiff indicated that it was physically possible to insulate a line carrying 7200 volts, but that, even insulated, it should be regarded as dangerous. Availability of an alternative to the uninsulated wire, however, does not in itself mandate its use. Defendants had a legal duty to insulate the wire over the Clintons' property only if it can be established that the conditions and circumstances indicated that persons might have come into reasonable proximity to the wire. *Ploense v. Illinois Power Co.,* 2 Ill. App. 3d 874, 879, 275 N.E.2d 920.

The electrical line extended over the yard of the Clintons' private residence. The line, elevated on three poles, was 22½ to 25 feet above the ground. Although there was testimony by the sheriff that there were burn marks on the wire after the occurrence, the record does not show exactly where the decedent touched the wire with the pole. The line was clearly

visible from the ground and was unobstructed by trees or other obstacles. Neither defendant had knowledge of any circumstances from which they could reasonably have anticipated that a 15-year-old boy would come in contact with a clearly visible and unobstructed wire suspended at a height of over 22 feet in his family's yard. See *Van Skike v. Zussman*, 22 Ill. App. 3d 1039, 318 N.E.2d 244.

The factual situation in this case differs significantly from cases which plaintiff claims support her position that the occurrence was reasonably foreseeable. *McGill v. Illinois Power Co.*, 18 Ill. 2d 242, 163 N.E.2d 454, involves the sufficiency of the complaint which the court held stated a cause of action by the allegation, taken as true by the motion to dismiss, that the defendant's employees knew that the plaintiff would be working close to the defendant's lines.

Similarly, in *Ploense v. Illinois Power Co.*, 2 Ill. App. 3d 874, 275 N.E.2d 920, the decedent was electrocuted while working on an outdoor advertising sign. Before this occurrence, the decedent's employer informed the defendant electric company that the proposed construction of the sign would be in close proximity to the electrical line. The court determined that the electric company's failure to inspect the wires after it was informed of the proposed work on the sign was adequate to show negligence.

Thus, in both *McGill* and *Ploense*, the electric company's duty to avert the danger presented by the uninsulated lines was based upon the company's knowledge that workmen were performing their jobs adjacent to the lines.

In *Austin v. Public Service Co.*, 299 Ill. 112, 132 N.E. 458, a 13-year-old boy was killed instantly when he touched the defendant's electric line which was stretched above a public bridge that was part of a public highway. The boy had climbed on top of the bridge and was walking across a beam to reach a bird's nest. The court did not dispute the fact that the question of negligence was properly submitted to the jury. It concluded that the electric company did not have a duty to insulate its entire system, but in this instance, the defendant could have reasonably anticipated that the employees of the town might lawfully be present on the public bridge to paint or repair it. Thus, the question of negligence was properly submitted to the jury.

The court used analogous reasoning in *Merlo v. Public Service Co.*, 381 Ill. 300, 45 N.E.2d 665, to support its conclusion that the defendant had a duty to insulate its wires at the scene of the occurrence. In *Merlo*, two sewer construction workers standing in the street were killed when they came in contact with a cable attached to the boom on a crane after the crane touched the electric company's transmission wires. The electric company argued that it had no duty to insulate the wires at places where

it might have reasonably anticipated that persons in the exercise of ordinary care might come in contact with its wires; and that since the wires at the lowest point were still more than 20 feet above the ground, as required by the rules of the Commerce Commission, no duty to the decedent was violated by the defendant. The court noted that it could be reasonably expected that men would likely be working in the streets, where they had a lawful right to be, with modern machinery for the purpose of laying or making repairs to sewers. Under these circumstances, the distance of the wires from the ground, combined with the frayed weatherproofing on the wires (which the court considered to be insulation), was sufficient evidence from which the jury could find negligence.

Both *Merlo* and *Austin* are readily distinguishable from the facts of the instant case in several crucial respects. In both cases, the occurrences happened on a public street where it was foreseeable that street construction workers or telephone linemen would have occasion to use the street in their employment and would either have machinery or would themselves be close to the defendant's dangerous wires. In *Merlo*, the workmen had a lawful right to use the street in order to perform their jobs. In *Austin*, the reasonable foreseeability of workmen on public property was sufficient to impose a duty to insulate on the defendant even though there was no indication by the court that they considered the decedent himself to be foreseeable. The wires in the present case were privately owned by James Clinton and extended over the Clintons' private property. Access to the wire was not comparable to that on a public thoroughfare. Therefore, neither the decision in *Austin* nor in *Merlo* supports the plaintiff's position on the issue of foreseeability.

■■ Phillip Harris, plaintiff's expert witness, testified that the Illinois Commerce Commission's regulations required that the wires be placed 18 feet above private property and did not require that such wires be insulated. At the time of the occurrence, the wires were 22½ to 25 feet from the ground. Harris testified that elevation of the wires was recognized as an alternative to insulation by the Commerce Commission. Proof of compliance with the Commission's safety rules is considered evidence tending to show due care but it is not conclusive on the question of negligence. *Merlo v. Illinois Power Co.*, 381 Ill. 300, 45 N.E.2d 665.

■■ We feel that to require defendants under the facts of this case to have used an insulated line over the Clintons' property would in effect be tantamount to requiring defendants and all who are engaged in the business of supplying electrical service to insulate all of their lines. Factors in addition to the foreseeability of occurrences must be taken into consideration in determining defendants' legal duty; the likelihood of the injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon defendants (*Lance v. Senior*, 36 Ill. 2d 516,

518, 224 N.E.2d 231), as well as public policy and social requirements. (*Mieher v. Brown*, 54 Ill. 2d 539, 545, 301 N.E.2d 307.) The minimal risk of injury does not justify the imposition of such a heavy burden on the electrical business nor on the public who will undoubtedly bear the ultimate cost. See *Mieher v. Brown*, 54 Ill. 2d 539, 301 N.E.2d 307.

■■ We are unable to find any cases in this jurisdiction which are factually analogous to facts before us. However, the facts in *Foote v. Scott-New Madrid-Mississippi Electric Cooperative* (Mo. App. 1962), 359 S.W.2d 40, are remarkably similar. In *Foote*, a 16-year-old boy was electrocuted when he threw a can with a copper wire attached over an uninsulated wire adjacent to his family's rural home. The wire, clearly visible from the ground, carried 7200 volts and was 25½ feet above the ground. The court held that it was not reasonably foreseeable that a minor would come into contact with an energized wire 25½ feet from the ground in a farm yard. The court said that it could not consider the contact to be reasonably foreseeable without repudiating the doctrine that those engaged in generating, transmitting or distributing electric energy are not absolute insurers of the public safety. We concur in the Missouri court's analysis. The plaintiff has failed to show the existence of a duty owed to him by the defendants and thus as a matter of law is not entitled to recover in tort for negligence. *Boyd v. Racine Currency Exchange, Inc.*, 56 Ill. 2d 95, 306 N.E.2d 39.

A second act which plaintiff claims constitutes negligence is the defendants' placement of the transformer on the pole closest to the Clintons' house, since such placement required the 7200-volt line to extend 300 feet across the Clintons' property. Plaintiff's position is that the transformer should have been placed on the pole closest to the road with a 220-volt line extending from the transformer across the poles to the house; then, decedent would have touched a line with considerably less voltage.

Defendant Hassel said that in order to get adequate service, the transformer had to be placed on the poles closest to the Clintons' house. Phillip Harris, plaintiff's expert witness, testified that a residence would receive adequate electrical service if a transformer were placed on a pole about 400 feet from the residence by greatly increasing the size of the wire. On cross-examination, Harris stated that if the house was plagued by flickering lights when the transformer was only 50 to 60 feet from the house, a great voltage drop was indicated.

Assuming that the transformer could have adequately performed if it were placed 400 feet from the Clintons' house, we conclude that the defendants had no legal duty to so position it. We concluded above that the occurrence was not reasonably foreseeable and thus defendants had no duty to insulate the wires over the Clintons' property. For the same reasons we hold that the defendants were not obliged alternatively to place

the transformer so that a line carrying 220 volts instead of 7200 volts spanned the Clintons' property.

■■■ Even if we were to hold that defendants had a duty to place the transformer differently, plaintiff's claimed cause of action would not be aided since there is no causal connection between the defendants' alleged negligence and Robert Clinton's death. The only testimony on the issue of whether contact with an uninsulated low voltage line would cause death was by Phillip Harris, plaintiff's own expert witness, who testified that contact with a 240-volt line under certain circumstances is capable of electrocution. No evidence was introduced at trial to show that Robert Clinton's death might have been prevented if he had touched a 220- or a 240-volt line. Thus, there was a complete failure of proof to show that the placement of the transformer caused the decedent's death. "[A]n act or an omission is not regarded as a cause of an event if the particular event would have occurred without it." (Prosser, Law of Torts §41, at 238 (4th ed. 1971).) No liability exists unless a defendant's alleged negligence is the legal cause of a plaintiff's injury. (*Pitts v. Basile*, 35 Ill. 2d 49, 54, 219 N.E.2d 472; *McInturff v. Chicago Title & Trust Co.*, 102 Ill. App. 2d 39, 243 N.E.2d 657.) Plaintiff's total failure to demonstrate in the case at bar that defendants' negligent omission proximately caused the injury complained of properly results in a directed verdict as a matter of law. *Welch v. Paulson's Enterprises, Inc.*, 118 Ill. App. 2d 183, 254 N.E.2d 274; *Masters v. Central Illinois Electric & Gas Co.*, 7 Ill. App. 2d 348, 129 N.E.2d 586.

Plaintiff has failed to prove that defendants breached a legal duty which proximately caused Robert Clinton's death; it is therefore unnecessary for us to consider the issue of contributory negligence.

Judgment affirmed.

GOLDBERG, P.J., and O'CONNOR, J., concur.