SANFORD KERNS, Plaintiff-Appellee, *v.* GUSTAV ENGELKE *et al.*, d/b/a Engelke Dairy Farm, *et al.*, Defendants-Appellants.—(MELVIN TIMMERMAN, d/b/a Timmerman Implement Company, Defendant-Appellant-Appellee.)

Fifth District   No. 75-225

Opinion filed July 26, 1977.—Rehearing denied December 12, 1977.

John T. Pierce, Jr., of East Alton, for appellant Fox River Tractor Company.

Burton C. Bernard and William G. Kaseberg, both of Bernard and Davidson, of Granite City, for appellant-appellee Timmerman Implement Company.

Hoagland, Maucker, Bernard & Almeter, of Alton (James K. Almeter, of counsel), for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendants, Fox River Tractor Company (Fox River), and Melvin Timmerman, doing business as the Timmerman Implement Company (Timmerman), appeal from judgments entered by the Circuit Court of Madison County on jury verdicts finding them jointly liable for personal injuries suffered by the plaintiff, Sanford Kerns, and awarding damages in the amount of $225,000. Fox River also appeals from the court's judgment directing a verdict on Timmerman's counterclaim against Fox River for indemnification.

Plaintiff was injured while helping to set up for operation an implement of farm machinery, called a long-hopper forage blower, owned by his

employers, Gustav and Leola Engelke. The forage blower was manufactured by Fox River and sold to the Engelkes by Timmerman. Plaintiff's complaint charged the Engelkes with negligence and stated causes of action against Fox River and Timmerman based upon strict liability in tort. The count of the complaint based upon strict liability alleged that the forage blower was unreasonably dangerous because its design failed to provide a mechanism to hold or cradle the power take-off assembly when the blower was being moved, and because there was no warning that the power take-off assembly should be removed when the blower was being moved. After a jury trial, all defendants, including the Engelkes, were found liable for plaintiff's injuries. As will be explained later in this opinion, however, the Engelkes did not appeal.

The forage blower is used to place ensilage into silos for storage. This is accomplished by placing the silage into a rectangular trough, referred to as the machine's hopper. The silage is then moved by a conveying device along the hopper and blown into the silo through a spout. The power necessary to operate the forage blower must be provided by an external source. For this reason, the blower is equipped with a power take-off assembly (PTO). The PTO consists of a shaft with a universal joint and a "quick disconnect" button located at each end. When one end of the PTO is attached to the forage blower and the other end is attached to the power take-off of a tractor, power generated by the engine can be transmitted to the forage blower. When the forage blower and tractor are properly connected, the PTO extends at an angle from one of the long sides of the hopper. The "quick disconnect" buttons are provided so that the PTO can be attached to or disconnected from either the blower or the tractor, as the situation requires. When one end of the PTO is attached to the forage blower or tractor, and the other end remains unattached, the universal joint assembly makes it possible to rotate the PTO shaft somewhat less than 90 degrees in any direction.

It is often necessary to move a forage blower from one silo to another. For this reason, the blower is equipped with a set of wheels and with a "tongue," by which it can be hitched to a tractor or other vehicle. The wheels are parallel to the length of the hopper and the tongue is attached to the hopper at the end opposite the blower mechanism. The PTO must be disconnected from the tractor whenever the forage blower is moved. It may or may not be removed from the forage blower. Two problems arise when the PTO is not removed from the forage blower before transportation. Because of the placement of the wheels, hitch and PTO, the PTO extends from the side of the machine. The resultant increase in the width of the forage blower is obviously undesirable, at least when the machine is transported over roadways. This problem can be alleviated to some extent by rotating the PTO on its universal joint either upward or to

one side or the other. It is impossible, however, to turn the PTO a full 90 degrees, because movement of the shaft is blocked by metal guards and other devices placed near the point of connection between the PTO and the forage blower. The second problem is that the PTO will drag on the ground unless some method of holding it up is devised.

Plaintiff, who had had previous experience working on ranches and farms, was employed by the Engelkes in August of 1968. He worked under the direction of the Engelke's son, Charles, and one Wilbur Leuscher. Both of these men knew that before moving the forage blower, the PTO could be removed and placed in the hopper, or otherwise moved separately to the new location. It is not clear whether plaintiff was familiar with the "quick disconnect" arrangement. When moving the forage blower a short distance, Engelke and Leuscher customarily left the PTO connected to the blower and supported it off the ground by tying one end of a piece of twine or bailing wire to the PTO and tying the other end to the body of the blower.

At the end of the work day on September 22, 1968, plaintiff assisted Charles Engelke and Wilbur Leuscher in "tying up" the PTO with bailing wire, in the manner described above. When plaintiff reported for work on the following day, he noticed that the forage blower had been moved to a different location. He was later summoned to help in connecting the PTO to a tractor. At that time, the PTO was still secured by the wire which had been attached on the previous day. Plaintiff testified at trial that Charles Engelke instructed him to hold the shaft of the PTO while Engelke removed the wire. Engelke discovered, however, that he could not remove the wire manually, so he asked Wilbur Leuscher to give him something to cut it with. Leuscher handed Engelke a pair of pliers or wirecutters with which he cut or untied the wire.

Once the wire was removed, plaintiff rested the unattached end of the PTO on the ground. Wilbur Leuscher then left the area to do other work and Charles Engelke walked over to the tractor, which was parked nearby. Engelke backed the tractor toward the forage blower so that he and plaintiff could connect the PTO. As Engelke approached in the tractor, plaintiff bent over and began lifting the PTO shaft. After lifting it only a short distance, however, he felt something strike him in the eye. Plaintiff stated that he did not know whether it was the wire which struck him; in fact, he could not recall seeing the wire after Charles Engelke removed it. Plaintiff was severely injured in this accident and, eventually, his eye was surgically removed.

Wilbur Leuscher and Charles Engelke both testified that Leuscher was not present when the wire was removed from the forage blower nor when plaintiff was injured. Engelke stated that the PTO was still tied up with

wire when he was backing the tractor. He saw the wire "come loose" prior to plaintiff's accident but did not know whether plaintiff had untied it. He did not see the wire strike plaintiff's eye.

■■■ The appellants' first contention is that plaintiff was required to plead and prove that an alternative design for moving the forage blower and PTO was feasible under the state of the manufacturing art at the time the machine was manufactured. We disagree. In a case tried on a strict liability theory, the focus is on the product, not the supplier's conduct. The seller or manufacturer may be held liable even though he has exercised all possible care in the preparation and sale of his product. In *Cunningham v. MacNeal Memorial Hospital*, 47 Ill. 2d 443, 266 N.E.2d 897 (1970), an action was brought against a hospital by a patient who had contracted serum hepatitis from defective blood supplied by the hospital. The supreme court decided that the hospital could be held liable even though the state of medical science was such that there were absolutely no means by which the existence of serum hepatitis virus could be detected in whole blood. In reaching this decision, the court reasoned that:

> "To allow a defense to strict liability on the ground that there is no way, either practical or theoretical, for a defendant to ascertain the existence of impurities in his product would be to emasculate the doctrine and in a very real sense would signal a return to a negligence theory." (47 Ill. 2d 443, 453, 266 N.E.2d 897, 902.)

The state of the art, concluded the court, "is of absolutely no moment." (47 Ill. 2d 443, 455, 266 N.E.2d 897, 903. See also *Stanfield v. Medalist Industries, Inc.*, 34 Ill. App. 3d 635, 340 N.E.2d 276 (2d Dist. 1975); *Matthews v. Stewart Warner Corp.*, 20 Ill. App. 3d 470, 314 N.E.2d 683 (1st Dist. 1974); *Gelsumino v. E. W. Bliss Co.*, 10 Ill. App. 3d 604, 295 N.E.2d 110 (1st Dist. 1973).)

We think that the same reasoning applies here, and that appellants' reliance on *Sutkowski v. Universal Marion Corp.*, 5 Ill. App. 3d 313, 281 N.E.2d 749 (3d Dist. 1972), and *Lolie v. Ohio Brass Co.*, 502 F.2d 741 (7th Cir. 1974), is misplaced. Those cases did not hold, as appellants suggest, that plaintiff must plead and prove that an alternative design was feasible under the state of the manufacturing art at the time the machine was manufactured. What they decided was the quite different proposition that plaintiffs' evidence of post-occurrence changes in a product, offered to demonstrate that an alternative design was feasible, is admissible. The dictum of the *Sutkowski* court to the effect that "a manufacturer's product can hardly be faulted if safer alternatives are not feasible" (5 Ill. App. 3d 313, 319, 281 N.E.2d 749, 753), to the extent that it is in conflict with *Cunningham, Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965), and Restatement (Second) of Torts §402A(2)(a) (1965), is not the

law in Illinois. A finding of fault is not a prerequisite to the imposition of strict liability. Nor do we think that the "standard of proof" stated in *Lolie*[1] is consistent with the Illinois authorities.

Appellants' second argument is that, as a matter of law, the forage blower was not unreasonably dangerous at the time it left their control. They state that moving the forage blower without removing the PTO was a "non-intended" use and that plaintiff would not have been injured if the PTO had been removed. In other words, appellants argue that plaintiff's injury resulted from a "misuse" of their product.

■■ ■ supplier may be liable for an injury caused by a "non-intended" use if such a use is foreseeable—that is, if it should be known to the reasonably prudent manufacturer. (*Dunham v. Vaughan & Bushnell Manufacturing Co.*, 86 Ill. App. 2d 315, 229 N.E.2d 684 (4th Dist. 1967), *aff'd* 42 Ill. 2d 339, 247 N.E.2d 401 (1969).) Therefore, whenever the defense of misuse is raised, the question is whether such "misuse" was reasonably foreseeable. (See *Lewis v. Stran Steel Corp.*, 57 Ill. 2d 94, 311 N.E.2d 128 (1974).) Whether a particular use is foreseeable, or objectively reasonable to expect, is ordinarily a question of fact for the jury's determination. *Winnett v. Winnett*, 57 Ill. 2d 7, 310 N.E.2d 1 (1974); *Williams v. Brown Manufacturing Co.*, 93 Ill. App. 2d 334, 236 N.E.2d 125 (5th Dist. 1968), *rev'd on other grounds*, 45 Ill. 2d 418, 261 N.E.2d 305 (1970); *Stanfield v. Medalist Industries, Inc.*, 34 Ill. App. 3d 635, 340 N.E.2d 276 (2d Dist. 1975); *Krammer v. Edward Hines Lumber Co.*, 16 Ill. App. 3d 763, 306 N.E.2d 686 (1st Dist. 1974).

The evidence in the instant case showed that the PTO weighed approximately 60 pounds and that some effort was required to attach or remove it because it fit snugly on the forage blower. Both Dr. Norval Wardle, plaintiff's expert witness, and appellant Melvin Timmerman stated at trial that "tying up" the PTO before moving a forage blower was a common practice. Timmerman testified that he, personally, had done so when moving short-hopper forage blowers. On the other hand, an expert witness called by defendants testified that "tying up" the PTO was not a customary or foreseeable practice and that he had never seen it done. However, other evidence was admitted indicating that some short-hopper forage blowers were equipped with devices for holding or cradling the PTO and that Fox River had considered attaching similar devices to its long-hopper model when it was being developed for production.

---

[1] In *Lolie*, the court said that in a design defect case the plaintiff must prove, *inter alia*, that: "1) the product as designed is incapable of preventing the injury complained of; 2) there existed an alternative design which would have prevented the injury; and 3) in terms of cost, practicality and technological possibility, the alternative design was feasible." (502 F. 2d 741, 744.)

■■■ As the jury was properly instructed in this case, jurors "have a right to consider all the evidence in the light of [their] own observation and experience in the affairs of life." (See IPI Civil No. 1.04.) Everyday experience indicates that the operator of a forage blower would devise some method to avoid, as much as possible, handling an unwieldy piece of machinery such as the PTO. Moreover, the manufacturer is charged with the knowledge of an expert and has a duty to keep informed of developments in his field. (*Williams v. Brown Manufacturing Co.*, 93 Ill. App. 2d 334, 236 N.E.2d 125 (5th Dist. 1968), *rev'd on other grounds*, 45 Ill. 2d 418, 261 N.E.2d 305 (1970); *Moren v. Samuel M. Langston Co.*, 96 Ill. App. 2d 133, 237 N.E.2d 759 (1st Dist. 1968).) We feel that there was sufficient evidence to present the issue of foreseeability of misuse to the jury.

■■■ In addition to alleging that the forage blower was defectively designed, plaintiff also alleged that it was unreasonably dangerous because there was no warning that the PTO should be removed when the machine was being moved. Even though a product may be faultlessly made, if it is not reasonably safe for a foreseeable use, the public policy of this State imposes a duty on the supplier of the product to give an adequate warning of its dangerous propensities. (*Dunham v. Vaughan & Bushnell Manufacturing Co.*, 86 Ill. App. 2d 315, 229 N.E.2d 684 (4th Dist. 1967), *aff'd*, 42 Ill. 2d 339, 247 N.E.2d 401 (1969); *Jonescue v. Jewel Home Shopping Service*, 16 Ill. App. 3d 339, 306 N.E.2d 312 (2d Dist. 1973).) As we said in *Williams v. Brown Manufacturing Co.*, 93 Ill. App. 2d 334, 360, 236 N.E.2d 125, 139, "failure to warn may itself be the defect" in a strict products liability case." (See also *Frisch v. International Harvester Co.*, 33 Ill. App. 3d 507, 515-16, 338 N.E.2d 90, 97 (1st Dist. 1975), and authorities cited.) Because the purpose of a warning is to apprise someone of a danger of which he is not aware, so that he can protect himself against it, there is, of course, no duty to warn where the danger is obvious or known to the user. *Jonescue v. Jewel Home Shopping Service; Weiss v. Rockwell Manufacturing Co.*, 9 Ill. App. 3d 906, 293 N.E.2d 375 (1st Dist. 1973); *Willeford v. Mayrath Co.*, 7 Ill. App. 3d 357, 287 N.E.2d 502 (4th Dist. 1972).

■■ Appellants contend that an adequate warning was given. They also argue that such a warning was unnecessary for two reasons. First, because the Engelkes and Wilbur Leuscher knew that the PTO could be removed. Second, because the danger involved in moving the forage blower without removing the PTO was obvious. In our opinion, plaintiff's allegation that a warning was required but not given presented a question for the jury. Therefore, even if we were to assume that the design of the forage blower was not, in itself, unreasonably dangerous, we would not be required to reverse the judgment of the trial court.

■■ An instruction manual given to the Engelkes when they purchased the forage blower contained pictures, entitled "Method of Transport," depicting the forage blower with its PTO removed. Appellants rely on these pictures and on the old adage that one picture is worth a thousand words in arguing that an adequate warning was given. At most, however, the pictures merely informed the reader of the manual that the PTO *could* be removed, not that failure to do so was dangerous. As this court pointed out in *Williams v. Brown Manufacturing Co.*:

> " "*  * * [T]he manufacturer must give both adequate directions for use and adequate warning of potential danger. Directions and warnings serve different purposes. Directions are required to assure effective use, warning to assure safe use. It is clear from the better reasoned cases that directions for use, which merely tell how to use the product, and which do not say anything about the danger of foreseeable misuse, do not necessarily satisfy the duty to warn." (93 Ill. App. 2d 335, 361-62, 236 N.E.2d 125, 139-40, quoting from 1 Frumer-Friedman, Products Liability §8.05; see also T. Lambert, Editorial, 36 Atla. L.J. 1, 2 (1976), and authorities cited.)

Under this reasoning, it was clearly for the jury to determine whether an adequate warning was given. The same reasoning leads us to reject appellants' contention that a warning was unnecessary because the Engelkes and Wilbur Leuscher knew that the PTO could be removed. Such knowledge, alone, would not necessarily lead them to the conclusion that failure to remove the PTO was dangerous.

■■ We feel that it was also for the jury to determine whether the danger posed in moving the forage blower without removing the PTO was obvious. As Mr. Justice Seidenfeld wrote in *Jonescue v. Jewel Home Shopping Service*, 16 Ill. App. 3d 339, 306 N.E.2d 312 (2d Dist. 1973):

> "Even slight doubts from the obviousness of the consequences resulting from [a foreseeable non-intended use] should require the case to be submitted to a jury. The knowledge, experience, and ability to recognize harmful consequences may vary greatly among the large numbers of those foreseeable users * * *. In the instant case the addition of appropriate words of warning * * * would have constituted only a slight burden of precaution for defendant to have undertaken. In the interests of protecting the unsuspecting, the policy should be to require the manufacturer to assume such a small added burden of precaution. [Citations.]"
> 16 Ill. App. 3d 339, 347, 306 N.E.2d 312, 318.

Appellants further contend that the sole proximate cause of plaintiff's accident was Charles Engelke's negligence. They state their position as follows:

"According to plaintiff's own testimony the accident in question did not occur when the machine was in transit nor did the injury occur because the PTO was not removed when the machine was in transit. The PTO was wired up the day before. The next time plaintiff saw the machine was the next day and the machine had already been moved. * * *

[Plaintiff] was injured because his employer did not safely secure a wire. If the machine had been moved from silo to silo, about 15 feet, the day before the accident, with the PTO detached and then the PTO was reattached and wired up to keep it out of the mud, you probably would have had the same situation occur. Consequently, the lack of said warning cannot be considered in any way a proximate cause of the accident. The fact that the PTO was wired up and moved in that condition cannot be considered a proximate cause of the accident."

"Proximate cause" is a term of art which encompasses the distinct concepts of cause in fact and legal cause. Determining whether the defendant's conduct was a cause of plaintiff's injury involves nothing more than an analysis of the facts. Once it is established that the defendant's conduct has in fact been a cause of the injury, however, there remains the question whether the defendant should be legally responsible for what he has caused. As otherwise stated, the question is whether the policy of the law will extend defendant's responsibility to the consequences which have in fact occurred.

■■ Two tests are generally applied in determining the issue of causation in fact. Under the "substantial factor" test, the defendant's conduct is a cause of an event if it was a material element and a substantial factor in bringing it about. Under the second test, commonly called the "but for" rule, the defendant's conduct is not a cause of an event if the event would have occurred without it. See W. Prosser, Law of Torts §41 (4th ed. 1971); *Vlahovich v. Betts Machine Co.*, 101 Ill. App. 2d 123, 242 N.E.2d 17 (3d Dist. 1968), *aff'd*, 45 Ill. 2d 506, 260 N.E.2d 230 (1970); *Clinton v. Commonwealth Edison Co.*, 36 Ill. App. 3d 1064, 344 N.E.2d 509 (1st Dist. 1976).

■■ As Dean Prosser has pointed out, causation in fact is a question "upon which all the learning, literature and lore of the law are largely lost. It is a matter upon which any layman is quite as competent to sit in judgment as the most experienced court." (W. Prosser, Law of Torts 237 (4th ed. 1971).) For that reason, causation in fact is usually a question for the jury. We feel that the jury in this case could reasonably have concluded either that the alleged defects in the forage blower were substantial factors in bringing about plaintiff's accident, or that "but for" the defects plaintiff's accident would not have happened. (See *Felty v.*

*General Telephone Co.*, 47 Ill. App. 3d 427 (5th Dist. 1977).) The jury could just as easily have accepted appellants' views concerning the chain of causation, but it was not required to do so as a matter of law.

We must now consider whether appellants should be held legally responsible for plaintiff's injuries. The precise question presented is whether an intervening cause of plaintiff's accident, namely, Charles Engelke's negligence, should absolve appellants of liability. We think not.

■■ It is well settled that there may be more than one proximate cause of an injury and that the issue of proximate cause generally presents a question to be determined by the trier of fact. (*Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 117 N.E.2d 74 (1954); *Ray v. Cock Robin, Inc.*, 57 Ill. 2d 19, 310 N.E.2d 9 (1974).) A defendant is legally responsible for all of the "natural and probable" results of his actions, that is, for all the results which an ordinarily prudent person ought to have foreseen as likely to occur. It is not essential, however, that the defendant should have foreseen the precise injury which resulted from his act. *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366, 50 N.E.2d 497 (1943); see also *Lewis v. Stran Steel Corp.*, 57 Ill. 2d 94, 311 N.E.2d 128 (1974).

An intervening force is one which actively operates in producing harm to another after the defendant's act or omission has been committed. (*Buehler v. Whalen*, 41 Ill. App. 3d 446, 355 N.E.2d 99 (5th Dist. 1976).) An intervening force will not break a causal connection if that force was itself probable or foreseeable by the original wrongdoer. *Neering v. Illinois Central R.R. Co.*

Appellants assert that the sole proximate cause of plaintiff's injuries was Charles Engelke's failure to secure a wire. This failure, however, cannot be viewed in isolation. It occurred only because the PTO was "wired up" for transportation and should be considered part of that process. Having held that it was for the jury to decide whether wiring up the PTO was a foreseeable use, we cannot say, as a matter of law, that it was unforeseeable that plaintiff's employer would do so in a negligent manner. As was pointed out in *Green v. Welts*, 130 Ill. App. 2d 600, 265 N.E.2d 188 (2d Dist. 1971):

> "Questions which are composed of qualities sufficient to cause reasonable men to arrive at different results, inferences and conclusions, should not be determined as matters of law." 130 Ill. App. 2d 600, 605, 265 N.E.2d 188, 191.

■■ The supreme court has indicated that certain accidents may occur in such a "tragically bizarre" and "unique" manner that no legal duty to guard against them will be imposed upon the defendant. In *Cunis v. Brennan*, 56 Ill. 2d 372, 308 N.E.2d 617 (1974), for instance, the court held that a complaint based upon negligence did not state a cause of action, reasoning that:

"The circumstance here of the plaintiff's being thrown 30 feet upon the collision with a third person's automobile and having his leg impaled upon the pipe was tragically bizarre and may be unique. We hold that the remote possibility of the occurrence did not give rise to a legal duty on the part of the Village to the plaintiff to provide against his injury. * * * '[L]iability must stop somewhere short of the freakish and the fantastic.' [Citation.]" (56 Ill. 2d 372, 377-78, 308 N.E.2d 617, 620; see also *Mieher v. Brown*, 54 Ill. 2d 539, 301 N.E.2d 307 (1973).)

Seeing nothing freakish or fantastic in the sequence of events which led to plaintiff's accident here, we feel no hesitation in holding that appellants had a legal duty to provide against it. Whether plaintiff's injuries were the natural and probable result of the defective forage blower was for the trier of fact to determine.

Appellants also raise as issues on this appeal certain alleged errors of the trial court in submitting and refusing certain jury instructions. They object, in particular, to plaintiff's instruction 13, which sets out the elements of an action for strict products liability in language virtually identical to section 402A of the Restatement (Second) of Torts. In *Galluccio v. Hertz Corp.*, 1 Ill. App. 3d 272, 274 N.E.2d 178 (5th Dist. 1971), we found that this instruction correctly stated the law and, accordingly, approved its use. We see no reason to reconsider that decision in this case. (See *Dunham v. Vaughan & Bushnell Manufacturing Co.*, 86 Ill. App. 2d 315, 229 N.E.2d 684 (4th Dist. 1967), *aff'd*, 42 Ill. 2d 339, 247 N.E.2d 401 (1969).) Appellants further contend that the other instructions given were not supported by the evidence and did not inform the jury that plaintiff had the burden of proving that an alternative design was feasible. We find, however, that the evidence did support the instructions, and we have concluded above that plaintiff was not required to prove the feasibility of an alternative design.

■■ Finally, appellants assert that the trial court erred in refusing instructions which would have informed the jury that a manufacturer is not an insurer and has no duty either to manufacture an accident-proof product or to adopt every conceivable safety device. We feel that the jury was adequately and impartially instructed on those issues and that the refusal of appellants' instructions was not error.

Also argued as reversible error is the injection into the case of evidence of plaintiff's family situation and financial condition. At trial, plaintiff was permitted to state that he was married and had a family. He also mentioned "ADC," implying, in the following colloquy concerning his efforts to find work, that his family was receiving aid to dependent children:

"Q. Did you consult the Illinois Division of Rehabilitation?
A. Yes sir, all the time.

Q. And what * * * why was that?

A. Well, that was under, the ADC was one of the provisions under the ADC that I had to * * *

Q. What did they try * * * did they try to get you set up for a job?

A. Yes, sir."

Later during the trial, plaintiff's wife and son testified concerning plaintiff's physical condition and symptoms and his unsuccessful attempts to find work after his injury.

■■ ■ Appellants contend that they are entitled to a new trial because this evidence improperly influenced the jury's verdict. The general rule is that evidence of marriage and number of dependents is irrelevant in a suit for personal injuries. (*McKasson v. Zimmer Manufacturing Co.*, 12 Ill. App. 3d 429, 299 N.E.2d 38 (2d Dist. 1973).) Appellants argue that it was improper to permit plaintiff's wife and son to testify because the evidence contained in their testimony was already before the jury and the only purpose in calling them as witnesses was to arouse sympathy. These witnesses were not automatically disqualified from testifying because of their relationship with plaintiff, however, and we cannot say that the trial court abused its discretion in allowing them to relate to the jury their first-hand knowledge concerning plaintiff's condition. Nor do we think that plaintiff's domestic circumstances were unduly emphasized. The brief and inadvertent reference to ADC was, in our opinion, completely harmless. Therefore we do not think that appellants are entitled to a new trial on this basis. See *LeMaster v. Chicago Rock Island & Pacific R.R. Co.*, 35 Ill. App. 3d 1001, 343 N.E.2d 65 (1st Dist. 1976); *Hedrich v. Borden Co.*, 100 Ill. App. 2d 237, 241 N.E.2d 546 (1st Dist. 1968).

■■ ■ After completion of the instructions conference, defendants moved for a mistrial because plaintiff's wife and daughter were in the courtroom "surrounded by jurors." We can find only one Illinois case where it was held reversible error to permit members of plaintiff's family to remain in the courtroom. The basis of that decision was that it would have been error to admit evidence that plaintiff had a wife and children and that "[t]he law does not permit a person to do indirectly what he cannot do directly." (*Barnett v. Noble,* 155 Ill. App. 129, 131 (1910).) In the present case, the jury was already aware that plaintiff was a family man because his wife and son had been properly permitted to testify. Therefore, any prejudicial effect which the presence of Mrs. Kerns and her daughter may have had was minimal. We also note that in the *Barnett* case, defendant moved to exclude plaintiff's family from the courtroom and this motion was denied by the trial court. Appellants here did not request that the trial court prohibit the Kerns family from attending trial.

For this reason, we are inclined to believe that appellants have waived any objection they may have had on this issue.

■■ Also urged as error is the trial court's permitting plaintiff's expert witness, Dr. Norval Wardle, to testify that the forage blower was, in his opinion, unreasonably dangerous. Appellants argue that Dr. Wardle's testimony was "nothing more than his personal opinion." A detailed analysis of this issue would unnecessarily prolong an already lengthy opinion. Suffice it to say that Dr. Wardle is an agricultural safety engineer and his testimony indicates that he was thoroughly familiar with the long-hopper forage blower. In light of Dr. Wardle's academic credentials and demonstrated knowledge, we cannot say that his opinion was "mere guess and conjecture."

■■ Appellants further contend that the hypothetical question asked of Dr. Wardle was defective because it did not explain the manner in which plaintiff's accident occurred. The question was as follows:

> "With the additional foundation, Doctor, will you again assume the facts which I gave you earlier and tell us whether you have a judgment based upon a reasonable degree of professional certainty as to whether the machine as so delivered in relation to the power take-off unit was unreasonably dangerous?"

In essence, appellants seem to be arguing that Dr. Wardle was improperly permitted to state generally that the forage blower was unreasonably dangerous, rather than that it was unreasonably dangerous *when being moved*. The facts which plaintiff's counsel asked the witness to assume, however, all involved provisions for handling the PTO when the forage blower was being moved, and the hypothetical question was asked specifically "in relation to the power take-off unit." We think that this was sufficient to inform the jury of the scope of Dr. Wardle's opinion. While the hypothetical question may have been inartfully phrased, we do not feel that it constitutes reversible error.

After entry of judgment, the Engelkes and their insurance carrier entered into a "loan agreement" with plaintiff. Under the terms of this agreement, the insurer lent plaintiff $100,000, without interest, to be repaid from any amount collected by plaintiff on his judgments against Timmerman and Fox River. Plaintiff agreed to use "any and all legal and reasonable means" to collect damages from those defendants. The trial court later granted a post-trial motion filed by the Engelkes and entered judgment *n.o.v.* in their favor. The amended order granting judgment *n.o.v.* states that plaintiff agreed to the entry of said judgment in consideration of the loan agreement.

■■ Appellants now contend that the loan agreement is void and that the $100,000 advanced to plaintiff under its terms should be declared a partial satisfaction of the judgments against them. They argue that

because the Engelkes were already obligated to satisfy plaintiff's judgment, their promise to do so was not valid consideration for the contract. They conclude that the agreement was "a legal nullity." We cannot accept this argument, however, as the Engelkes gave up their right of appeal in entering into the agreement, and forebearance to assert a legal right constitutes valid consideration. If we decide that the loan agreement is void, we must do so upon considerations of public policy.

In *Reese v. Chicago, Burlington & Quincy R.R. Co.*, 55 Ill. 2d 356, 303 N.E.2d 382 (1973), an action was brought on behalf of a railroad employee who was killed at work when he was struck by the bucket of a crane. The decedent's widow sued both the railroad under the Federal Employers' Liability Act and the manufacturer of the crane on a theory of strict liability. The railroad counterclaimed against the manufacturer for indemnification. Immediately prior to trial, plaintiff and the railroad entered into a loan agreement similar to the one involved in the case at bar. The railroad was subsequently dismissed from the action and plaintiff's case against the manufacturer proceeded to trial; a verdict against the manufacturer resulted.

On appeal, the supreme court upheld the validity of the loan agreement. The court recognized that this type of contract could allow a concurrent tortfeasor to escape liability where he might otherwise be unable to obtain indemnification, but decided that the policy of denying contribution between joint tortfeasors was outweighed by considerations favoring the private settlement of lawsuits. According to the court, the principal objection to contribution—use of the courts for relief of wrongdoers—was absent because the loan agreement was a private arrangement. The court then stated that:

> "[T]here are salutary effects of the loan agreement which warrant our approval. Because of the potential savings to some tortfeasors, funds under this arrangement will be more readily offered to injured plaintiffs than is the case under a covenant to forbear from suit or an outright settlement. Secondarily, loan receipts may tend to simplify complex multi-party litigation, and are desirable from the standpoint of facilitating private resolution of litigation." 55 Ill. 2d 356, 364, 303 N.E.2d 382, 386.

We think that the court's analysis in *Reese* is equally applicable to the loan agreement involved here, despite the difference that in this case the agreement was not executed until after trial and judgment. In *Harris v. Algonquin Ready Mix, Inc.*, 59 Ill. 2d 445, 322 N.E.2d 58 (1975), however, the supreme court seems to have reconsidered the broad approval given to the loan agreement in *Reese*. The plaintiff in *Harris*, an employee of Pre-Cast Building Sections, Inc. (Pre-Cast), was injured when a crane, operating on land owned by Algonquin Ready Mix, Inc. (Algonquin), transmitted an electrical charge from a high-voltage power line of

Commonwealth Edison Company (Edison). Plaintiff filed actions against Algonquin and Edison. Edison filed a counterclaim and third-party action against Algonquin and Pre-Cast, respectively. Algonquin also filed a third-party action against Pre-Cast. A jury returned a verdict for the plaintiffs against Edison and Algonquin. The jury rejected both of Edison's claims for indemnity. Finally, the jury returned a verdict for Algonquin in its third-party action against Pre-Cast.

The appellate court reversed plaintiff's judgment against Algonquin and, accordingly, granted judgment *n.o.v.* in its favor. The court also reversed Algonquin's indemnity judgment against Pre-Cast. The court affirmed all the other judgments. After the appellate opinion was rendered, Edison and plaintiff entered into a loan agreement.

Plaintiff did not seek review of the reversal of his judgment against Algonquin. Edison, however, appealed to the supreme court contesting both the denial of its counterclaim against Algonquin and the reversal of *plaintiff's* judgment against Algonquin. Edison argued that it had standing to appeal from the reversal of plaintiff's judgment against Algonquin because Edison was thereby foreclosed from pursuing its indemnity action, because plaintiff joined with Edison in the latter's reply brief seeking reversal, and, finally, because the loan agreement between plaintiff and Edison gave the latter an interest in plaintiff's cause of action against Algonquin.

The supreme court held, first, that Edison's action for indemnity against Algonquin was improper. Because Edison had no right to indemnification from Algonquin, it did not have standing as an injured party to contest the reversal of plaintiff's judgment. The court then discounted plaintiff's support of Edison's position because it was predicated upon the terms of the loan agreement. Finally, the court held that the loan agreement did not afford a basis for Edison's challenge to the reversal of plaintiff's judgment. The court stated that:

> "Edison equates the 'loan agreement' to that approved by a majority of this court in *Reese v. Chicago, Burlington & Quincy R.R. Co.*, 55 Ill. 2d 356. Examination of our opinion in that case clearly shows that the 'loan agreement' was made prior to trial before liability of the multiple defendants could be adjudicated. There is no language contained therein which fairly suggests that such a procedure would be approved on appeal to provide a sole basis whereby a defendant, who is alleged to be a joint tortfeasor and against whom liability is determined, might seek consideration of an issue previously decided adversely to the plaintiff in his action against a co-defendant. Acquiescence to Edison's position under such circumstances would be tantamount to this court's approval of an assignment of a personal injury judgment on appeal to a party who has been found liable for the injury and who does

not now even contest this liability. *Moreover it would countenance an attempt at indirect indemnification under circumstances where indemnity is not proper.* We are of the opinion that *Reese* is not applicable \* \* \*." (Emphasis added.) 59 Ill. 2d 445, 451-52, 322 N.E.2d 58, 62.

As already noted, the supreme court in *Reese* upheld the use of loan agreements although it recognized that such agreements could allow concurrent tortfeasors to escape liability where they might otherwise be unable to obtain indemnification. The italicized sentence above, however, indicates to us that the court would limit the use of loan agreements to situations where the contracting defendant might otherwise be entitled to indemnification or to prejudgment situations where the liability of the parties has not been determined. As one commentator has pointed out:

> "The advantage of restricting 'guarantee clause' agreements to situations where the contracting defendant is asserting a right to indemnification from the other defendants is that while answering the objection against accomplishing by indirection what can't be done directly, it limits the use of loan agreements to the party least to blame, and allows him to shift liability to the party most to blame. Conversely, it prevents the opposite situation." R. Michael, *"Mary Carter" Agreements in Illinois*, 64 Ill. B. J. 514, 527 (1976).

■■ The same commentator explains that implementation of this restriction would require the formulation of a test or standard for deciding whether a claim for indemnification is sufficient for the purpose of supporting a loan agreement. We need not attempt to formulate such a test here, however, because the Engelkes, the contracting defendants, have not asserted a claim for indemnification from the other defendants. We hold that their loan agreement is void and that the money advanced to the plaintiff under its terms is a partial satisfaction of plaintiff's judgment.

We will now consider Fox River's contention that the trial court erred in entering judgment for Timmerman on his counterclaim against Fox River for indemnification. Contrary to Fox River's assertion that the counterclaim sounds in "active-passive conduct," its base is clearly strict products liability. When a dealer is held strictly liable for the sale of an unreasonably dangerous product, he is entitled to indemnification from the manufacturer who placed the defective product into the stream of commerce with knowledge of its intended use. (*Frisch v. International Harvester Co.*, 33 Ill. App. 3d 507, 338 N.E.2d 90 (1st Dist. 1975); see *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.*, 62 Ill. 2d 77, 338 N.E.2d 857 (1975).) Under this rule, Timmerman was clearly entitled to indemnification.

■■ Fox River also argues that Timmerman should not have been awarded a reasonable sum for attorney's fees and other expenses incurred

in defending the suit brought by plaintiff. It is well settled that a party who has successfully prosecuted or defended an action cannot recover his legal fees and other litigation expenses from the unsuccessful party. (*Mid-West National Bank v. Metcoff*, 23 Ill. App. 3d 607, 319 N.E.2d 336 (2d Dist. 1974); *Trustees of Schools v. Schroeder*, 8 Ill. App. 3d 122, 289 N.E.2d 247 (1st Dist. 1972).) This rule clearly bars the plaintiff in an indemnity action from recovering expenses incurred in pursuing the claim for indemnity itself. A different situation is presented, however, when the indemnitee seeks to recover attorney's fees and other expenses incurred in defending the prior action giving rise to the claim for indemnity. The few relevant Illinois cases have ignored this distinction, holding that litigation expenses arising from the suit underlying the asserted right to indemnity are not proper elements of damages in an indemnity action. That was the holding in *Reese v. Chicago, Burlington & Quincy R.R. Co.*, 5 Ill. App. 3d 450, 283 N.E.2d 517 (2d Dist. 1972), *aff'd*, 55 Ill. 2d 356, 303 N.E.2d 382 (1973), where the appellate court merely stated that:

> "* * * "[N]o case has been cited or found in Illinois which holds that expenses for investigation and trial preparation, together with attorney's fees, are elements of damage in an action for indemnity. * * * We think it is a fair conclusion that expenses and attorney's fees are recoverable only where required by the specific terms of a written contract of indemnity. [Citation.]" 5 Ill. App. 3d 450, 457-58, 283 N.E.2d 517, 522.

The court reached the same conclusion in *Insurance Co. of North America v. J. L. Hubbard Co.*, 23 Ill. App. 3d 254, 318 N.E.2d 289 (4th Dist. 1974), holding that an insurance company was not entitled to recover attorney's fees in an indemnity action against its agent. In so holding, the court considered cases, cited in *Ritter v. Ritter*, 381 Ill. 549, 46 N.E.2d 41 (1943), which stand for the following rule:

> "* * * [W]here the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorneys fees. (*Philpot v. Taylor*, 75 Ill. 309; *McEwen v. Kerfoot*, 37 id. 530; *Himes v. Keighblingher*, 14 id. 469.)" (381 Ill. 549, 554, 46 N.E.2d 41, 44.)

The court decided that these cases were distinguishable because they all involved actions to preserve property rights in real estate and because the defendant's conduct was characterized in each case "as either wilful, wanton, malicious, oppressive, or at least as being of an active tortious nature." 23 Ill. App. 3d 254, 262, 318 N.E.2d 289, 295.

The reasoning employed in the above cases is not persuasive.

According to most authorities:

> "Where a person is obliged to defend against the act of another, against whom he has a remedy over, he may, if such other has notice of the suit and an opportunity to defend, hold him liable not only for the amount of damages recovered against himself and which he is compelled to pay, together with interest thereon, but also for all reasonable and necessary costs and expenses incurred in such defense, including attorney's fees.

> While there is some authority to the contrary, it has been held that where it does not appear that the indemnitor was notified of the action against the indemnitee, and had not participated in such action, the measure of the indemnitee's damage against the indemnitor is limited to the amount which he has paid on the judgment recovered against him, together with interest thereon, and does not include the costs and expenses of defending the action; nor can such costs and expenses be recovered where it does not appear that the defense was solely against an act of the indemnitor." 42 C.J.S. *Indemnity* §24 (1944); see Annot., 45 A.L.R.2d 1183 (1956); D. Dobbs, Remedies §3.8, at 194-96 (1973); *General Electric Co. v. Mason & Dixon Lines, Inc.*, 186 F. Supp. 761 (W.D.Va. 1960); *Smith Radio Communications, Inc. v. Challenger Equipment, Ltd.*, 270 Ore. 322, 527 P.2d 711 (1974); *Miller v. New York Oil Co.*, 34 Wyo. 272, 243 P. 118 (1926).

■■■ In the instant case, the alleged defects in the forage blower were present when the machine left Fox River's control. Therefore, Timmerman was defending solely against Fox River's allegedly wrongful acts. Fox River, of course, had actual knowledge of the action and Timmerman tendered its defense to Fox River long before the case came to trial. Under these circumstances, we feel that Timmerman may properly claim its litigation expenses as an element of damage. Because the trial court's judgment entered in favor of Timmerman's counterclaim merely grants "a reasonable sum for legal fees, court costs and other expenses of defense," the cause must be remanded for a determination of the exact amount to which Timmerman is entitled. This will require the trial court to determine the percentage of Timmerman's expenses which are attributable to its defense in plaintiff's action.

The decision of the Circuit Court of Madison County is affirmed and the cause remanded for further proceedings consistent with the views expressed herein.

Affirmed and remanded.

JONES and G. J. MORAN, JJ., concur.