MARCIA J. RUCKER, Adm'x of the Estate of Clyde G. Rucker, Deceased, Plaintiff-Appellee, v. NORFOLK AND WESTERN RAILWAY COMPANY et al., Defendants.—(GENERAL AMERICAN TRANSPORTATION COMPANY, Defendant-Appellant.)

Fifth District    No. 77-19

Opinion filed September 6, 1978.

JONES, J., dissenting.

Robert Wilson, of Burroughs, Simpson, Wilson, Hepler & Broom, of Edwardsville, for appellant.

John T. Pierce, Jr., of Pratt, Pierce, Bradford & Gitchoff, Ltd., of East Alton, for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendant, General American Transportation Company (GATX), appeals from the judgment entered by the Circuit Court of Madison County on a jury verdict finding it jointly liable with Norfolk and Western Railway Company (N&W) for the wrongful death and personal injury prior to death sustained by plaintiff's intestate Clyde G. Rucker, and awarding damages in the amount of $850,000. On appeal, GATX prays for judgment notwithstanding the verdict, or alternatively a new trial, contending that numerous pretrial and trial evidentiary rulings of the lower court were incorrect; that certain instructions to the jury were improper; and that certain rulings by the trial court concerning the pleadings in this case were improper. GATX has also filed a motion, which we have taken with the case, to limit execution and for credit and

reduction upon judgment based upon a certain "loan receipt agreement" entered into after the jury verdict by the plaintiff and N&W.

Plaintiff's intestate, an employee of N & W, suffered fatal injuries while in the course of his employment as a result of an explosion that took place at N & W's switchyard in Decatur, Illinois, on July 19, 1974. Plaintiff's fourth amended complaint charged N & W with violations of the Federal Employers' Liability Act (45 U.S.C. §51 *et seq.* (1970)) and the Safety Appliance Act (45 U.S.C. §1 *et seq.* (1970)), and stated causes of action based upon strict liability in tort against GATX and Phillips Petroleum Company (Phillips) as the builder and lessee respectively, of GATX No. 41623, an LP jumbo tank car. In its answer to the plaintiff's complaint, N & W asserted counterclaims against both GATX and Phillips praying for indemnity for all damages resulting from the explosion, including the instant case. Because of other collateral actions and motions by Phillips, the counterclaims of N & W against GATX and Phillips for indemnity were severed from the instant cause by an order of the Illinois Supreme Court and are currently pending in the Circuit Court of Macon County, Illinois.

The N & W operates a railway system throughout several states, and handles and transports railroad freight cars. At its switchyard or classification yard in Decatur, the N & W receives and breaks up trains, and makes up new trains for travel to further destinations. Various rules, known as Interchange Rules, have been developed by the railroad industry, including manufacturers, shippers and government representatives, which require each railroad to accept every railroad car tendered to it under certain published criteria called "Tariffs," if the car meets certain visual safety standards.

GATX is a major builder of railroad freight and tank cars, including those known as jumbo tank cars designated as the 112-114 series. These cars have a capacity of 30,000 to 35,000 pressurized gallons of liquified petroleum gas (LPG), and when fully loaded weigh approximately 260,000 pounds. These tank cars are actually steel cylindrical tanks that ride on wheels, known as trucks, which in turn support coupler systems. The ends of the tank are approximately hemispheric in shape and made of steel approximately 11/16″ in thickness.

In 1970, a cooperative project was developed by two railroad trade associations, the Railway Progress Institute (RPI) and the Association of American Railroads (AAR), to study the causes of ruptures and punctures of railroad tank cars. The joint project was commissioned by the Federal Railway Administration (FRA) of the United States Department of Transportation (DOT) and consisted of representatives of railroads, shippers and manufacturers, including GATX. In the course of its study, the RPI-AAR Joint Project gathered records and statistical data from railroads and tank car manufacturers concerning accidents in the railroad

environment. In August 1971, the joint project issued its final report to the FRA. Table A-7 of the report, entitled "Loss Caused by Head Punctures, Loaded Non-Insulated Steel Pressure Cars, Class DOT 112 A-W, 114 A-W," consisted of a short description of some 42 accidents involving head punctures of the 112-114 tank car series which had occurred in the railroad environment between 1965 and 1970. Of these 42 head punctures approximately 26 were caused by the head of a tank car being punctured by the coupler of an adjacent car. Two of the proposed solutions to prevent tank car head punctures were the installation of headshields and/or top and bottom shelf couplers in order that one or the other device would prevent the coupler on an adjoining car from rising up and puncturing the head of the tank car. Subsequent to the issuance of the joint project's report, experimental headshields were installed on approximately 100 tank cars.

The tank car in question, GATX No. 41623, was manufactured by GATX in September 1971 and was leased to Phillips in that year for transportation of LPG. In July 1974, Phillips loaded GATX No. 41623 with LPG in Tuscola, Illinois, to be shipped with four other Phillips jumbo tank cars to the Phillip's plant in East St. Louis, Illinois. On July 19, 1974, the switch crew on duty at the N& W classification yard in Decatur received a cut of cars containing GATX No. 41623 and the other four jumbo tank cars. Prior to switching the tank cars onto track 11, the switching crew had switched an empty boxcar, NW No. 49203, onto that track. Sometime later, the crew switched the five tank cars onto track 11 with the lead car being GATX No. 41623.

From the evidence adduced at trial, it appears that the five car cut of tank cars was released and allowed to roll onto track 11 at approximately 5 a.m. on July 19, 1974. The tank cars rolled some 2700 feet in an easterly direction on track 11 resulting in the eastern most coupler of GATX No. 41623 impacting with the western coupler of the standing boxcar, NW No. 49203. The resulting impact apparently caused the boxcar's western coupler to rise up and penetrate the easterly head of GATX No. 41623, thereby permitting the escape of LPG into the switchyard. A few minutes later, the then vaporized LPG found an ignition source and exploded in several bursts causing widespread property damage, personal injuries and seven deaths, including that of plaintiff's decedent. Subsequent to the accident, the DOT issued an order, effective August 30, 1974, requiring that all DOT 112A and 114A tank cars be equipped with headshields (49 CFR §179.100—23).

As stated earlier, plaintiff's fourth amended complaint with respect to GATX and Phillips sounded in strict liability in tort charging them with placing a defective product into the stream of commerce. Specifically, each was charged with the knowledge that the tank car was to be used for LPG transportation; that each knew the hazardous characteristics of LPG;

and that the tank car was not reasonably safe for its intended use of transporting LPG by rail. From the beginning of the case, GATX and Phillips sought to develop and introduce evidence that GATX No. 41623 met all industrial and Federal standards and specifications for its design and manufacture. Motions challenging the pleadings, objections at the time depositions were taken, and arguments at every pretrial conference repeatedly involved the question of whether compliance with industrial and Federal standards and specifications was admissible on behalf of the defendants, GATX and Phillips. In March 1976, plaintiff filed a motion in limine that was vigorously argued by both sides. The plaintiff's motion was allowed in its entirety and resulted in GATX and Phillips being precluded, *inter alia*, from introducing any evidence of compliance with certain industrial and Federal standards and specifications; from mentioning in any manner the state of the art of manufacturing the tank car in question; and from mentioning in any manner that the plans and specifications for series No. 112 and No. 114 tank cars, including GATX No. 41623, had to be approved by the AAR and/or the DOT.

Immediately before the jury was selected, N & W filed a "Limited Admission of Liability" admitting liability under the Safety Appliance Act counts of plaintiff's complaint stating that it was not to be construed as an admission of factual responsibility nor an admission that such violation was the proximate cause of the occurrence. Plaintiff thereupon dismissed her claims against N & W under the FELA theory of liability. GATX's motions to continue, sever and dismiss in view of N & W's admission of liability were denied. Trial proceeded against GATX and Phillips on the strict liability in tort theory, and against N & W on the issue of damages only. During virtually every witness' testimony offers of proof were made by GATX, out of the presence of the jury, as to AAR standards. At various times during the lengthy trial, motions were made to the trial court to set aside or modify its ruling on the plaintiff's motion in limine because of a claimed waiver by virtue of evidence introduced by plaintiff. All of these motions were denied by the trial court and, consequently, no evidence of any of the matters outlined above in the plaintiff's motion in limine was presented to the jury by the defendants.

At the close of plaintiff's case Phillips' motion for a directed verdict was granted, basically upon the theory that a lessee of a tank car cannot be liable under the theory of strict liability in tort. On July 2, 1976, the jury returned its verdict in favor of the plaintiff and against GATX and N & W in the amount of $850,000. Subsequent to the denial of GATX's post-trial motion, negotiations commenced between the plaintiff and N & W relative to a possible loan agreement. Apparently the subject was first broached on or about October 15, 1976, during the period in which the

defendants could file their notice of appeal. The loan receipt agreement was executed on October 22, 1976, copies of which were served upon all courts involved and all interested parties. The plaintiff received $700,000 from N & W under the agreement and has agreed to pursue all available means to collect the proceeds of the $850,000 judgment from GATX. Consequently, only GATX appeals from the judgment below.

■■ GATX's first contention is two-fold: (1) that the State of Illinois is prohibited by the commerce clause of the United States Constitution from imposing tank car design specifications that conflict with or augment federally prescribed design specifications; and (2) that the Federal design specifications which existed prior to the Decatur accident prohibited manufacturers from placing into service a tank car equipped with headshields as advocated by the plaintiff. The plaintiff initially urges that this argument has been waived by GATX because of its failure to cite as error the denial of its various offers of proof on these issues by the trial court. In this regard, we agree with GATX that the argument was sufficiently preserved by its assertion in its brief that the lower court erred in granting plaintiff's motion in limine, a good portion of which dealt with the above-stated issues.

■■ GATX urges that Congress, through the exercise of its powers under the commerce clause, has preempted the field of railroad safety in general. On this point the evidence supports GATX's claim that the tank car in question was manufactured in conformance with federally prescribed design standards and specifications. GATX cites as authority for its preemption argument the National Railroad Safety and Hazardous Materials Transportation Control Act (45 U.S.C. §431 *et seq.* (1970)) wherein in relevant part it provides:

> "The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. * * * A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce." (45 U.S.C. §434 (1970).)

Relying in part on *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108 (5th Cir. 1973), GATX urges that the jury verdict in favor of the plaintiff constitutes impermissible interference by the State with the above-stated section that mandates national uniformity in the area of railroad safety. We believe that GATX misconstrues *Donelon,* a case which involved an action by Louisiana parish officials for review of an FRA report finding that a railroad's roadbeds and tracks in the parish met Federal standards.

The court in *Donelon* held that individual officials of the parish were without authority to require a railroad to meet any safety standards beyond those provided for in the Act. We believe the court's decision was correct; however, we do not interpret it, nor the applicable section of the Act, to extend so far as to prohibit actions brought by injured persons against railroads or equipment manufacturers based upon the theory of strict liability in tort.

It is the plaintiff's position that her action for damages against GATX on a defective design products liability theory, and the resulting jury verdict in her favor, cannot be construed as an alteration of Federal tank car specifications nor a State mandate to GATX or any other manufacturer to equip tank cars with headshields. The plaintiff asserts that the jury verdict in no way affects or conflicts with existing Federal regulations, but rather is merely a finding by the jury that the tank car in question without headshields is unreasonably dangerous.

In support of her contention, plaintiff cites *Raymond v. Riegel Textile Corp.*, 484 F.2d 1025 (1st Cir. 1973), which involved a products liability action brought by the plaintiff pursuant to New Hampshire law. The suit was against a materials manufacturer for personal injuries to a minor child who was severely burned when her nightgown burst into flames. The manufacturer maintained that the material in question met the standards provided in the Federal Flammable Fabrics Act (15 U.S.C. §1191 *et seq.* (1970)) and pointed out to the court that the Act provided for Federal preemption of material flammability standards (15 U.S.C. §1203 (1970)). The *Raymond* court noted that the Act made no provision for private relief for those harmed in accidents involving flammable fabrics, and further noted that the legislative history of the Act indicated a congressional intent to increase the protection of consumers. Reasoning that the evident solicitude of Congress for the plight of burn victims must necessarily be taken into consideration when interpreting the supremacy clause of the United States Constitution, the court held that application of New Hampshire's common law strict liability standard in tort actions involving injuries from burning clothing was not incompatible with the provisions of the Act (484 F.2d 1025, 1027).

We are persuaded by the reasoning of the *Raymond* court and are unable to find any authority to support GATX's contention that an individual's action for personal injuries based upon a defective design products liability theory runs contrary to Federal statutes dealing with railroad safety. We are of the opinion that Federal preemption in the field of railroad safety extends only as far as to prevent conflicting State and local safety standards, and does not represent Federal encroachment into well-defined and well-established common law products liability theories that exist to insure redress to those who have suffered injuries.

Within the context of its preemption argument, GATX also asserts that because the evidence showed that GATX No. 41623 was built in compliance with federally prescribed specifications, the lower court erred in submitting the case to the jury on common law principles in violation of the commerce and supremacy clauses of the United States Constitution. GATX contends that to construe the regulations as permitting a manufacturer to modify or add to the specifications prescribed by the Federal Government ignores the clear intention of the Federal Government to permit no discretion by a manufacturer in the building of railroad tank cars. In essence, GATX urges that the Federal Government, having prescribed design specifications for the subject tank car, thereby bound GATX and other manufacturers to follow them without any modification whatsoever.

As we have earlier noted, the Federal regulations prescribing tank car design specifications require that DOT 112A and 114A tank cars built after August 30, 1974, be equipped with headshields (49 CFR §179.100—23). We also note that these regulations require a manufacturer to certify a tank car, and all equipment appurtenant thereto, as meeting all specifications before it is placed into service (49 CFR §179.5(a)). GATX maintains that these sections connote that a design feature which is not provided for in the regulations, as was true of headshields prior to August 30, 1974, is thereby expressly prohibited. We disagree and find that the evidence adduced at trial, and the offers of proof of GATX which were denied, belie this assertion.

Rolf Mowatt-Larssen, Director of the Office of Standards and Procedures of the DOT, testified, by means of an evidence deposition, that prior to the DOT order in July 1974 requiring headshields, tank car manufacturers could have installed them without DOT permission inasmuch as DOT regulations did not prohibit headshields. This was confirmed by Earl Phillips, project director of the RPI-AAR joint project and vice-president of engineering and development of Union Tank Car Company, who testified in an offer of proof by GATX that all changes in or additions to tank car design specifications were to be submitted to the AAR tank car committee for approval, and that construction could not begin until the proposed design had been approved as evidenced by issuance by the AAR of a certificate of construction. Phillips stated that this procedure was followed by several tank car manufacturers in 1973 before they applied headshields designated as the RPI-AAR design to approximately 100 tank cars. Phillips further testified in the offer of proof that prior to July 1974 GATX had submitted proposed headshield designs to the AAR which were subsequently rejected because of lack of testing and lack of proper specification development for its design and application. While we agree that the required AAR approval procedure

for modification of existing tank car design specifications made it more difficult for tank car companies to apply headshields prior to August 30, 1974, we find no merit in GATX's argument that it was absolutely prohibited from doing so prior to that date by the then existing Federal regulations prescribing tank car design specifications.

GATX next contends that the lower court erred in granting plaintiff's motion in limine which thereby precluded it from introducing evidence that the tank car in question complied with Federal and industrial standards and specifications, or from showing that at the time the tank car was manufactured application of a headshield was technologically and economically unfeasible. GATX urges that such evidence, which it refers to as evidence of the "state of the art," is admissible in strict liability for misdesign litigation to show that a product is not unreasonably dangerous. Moreover, GATX asserts that the trial court was under the misconception that the admission of evidence of a manufacturer's compliance with any "standard" is limited to cases sounding in negligence. It is GATX's position that a strict liability in tort case involving product design is akin to an action in negligence in which evidence concerning compliance with statutes, regulations, standards, testing procedures and the state of the art is admissible. In the alternative, GATX submits that inasmuch as the plaintiff "opened the door" by introducing evidence of Federal design specifications, it also should have been permitted to do so as a matter of fundamental fairness. Thus, GATX argues that the lower court's allowance of plaintiff's motion effectively choked off its principal defense and was prejudicial error. We disagree.

In a case, such as the instant cause, tried on a strict liability theory, the focus is not on the manufacturer's conduct, but rather on the product itself. The manufacturer may be held liable regardless of the degree of care he has exercised in the preparation and sale of the product. The fundamental difference between the strict liability and negligence products liability theories was stated in *Kossifos v. Louden Machinery Co.*, 22 Ill. App. 2d 587, 591, 317 N.E.2d 749, 752 (1st Dist. 1974):

> "Confusion is ever-present, of course, because of the fact that the condition of the product will always have been ultimately caused by the conduct, whether by commission or omission, of someone. But this interrelationship between the condition of the product and the conduct of the person must not be permitted to blur the basic distinction between the type of tort being alleged. Where the product is in an unreasonably defective condition, the conduct of the person who caused it to be in that condition may or may not have been negligent; whether that conduct was or was not negligent is irrelevant to strict product liability, because the liability is predicated solely on the condition of the product."

The distinction in the theories of products liability was also recognized by our supreme court in *Cunningham v. MacNeal Memorial Hospital,* 47 Ill. 2d 443, 266 N.E.2d 897 (1970), which involved an action brought against a hospital by a patient who had contracted serum hepatitis from defective blood supplied by the hospital. The court held that the hospital could be held liable even though the state of medical science was such that there was no testing method by which the existence of serum hepatitis virus could be detected in whole blood. In so deciding the court reasoned that:

> "To allow a defense to strict liability on the ground that there is no way, either practical or theoretical, for a defendant to ascertain the existence of impurities in his product would be to emasculate the doctrine and in a very real sense would signal a return to a negligence theory." (47 Ill. 2d 443, 453, 266 N.E.2d 897, 902.)

In addition, the court concluded that the state of the art "is of absolutely no moment." 47 Ill. 2d 443, 455, 266 N.E.2d 897, 903. See also *Kerns v. Engelke,* 54 Ill. App. 3d 323, 369 N.E.2d 1284 (5th Dist. 1977), *appeal allowed* ___ Ill. 2d ___; *Stanfield v. Medalist Industries, Inc.,* 34 Ill. App. 3d 635, 340 N.E.2d 276 (2d Dist. 1975); *Matthews v. Stewart Warner Corp.,* 20 Ill. App. 3d 470, 314 N.E.2d 683 (1st Dist. 1974).

■■ GATX seeks to distinguish the rejection in *Cunningham* of "state of the art" as a defense in strict products liability cases, arguing that the court in *Cunningham* was not confronted with a case involving product design, but rather a contaminated product. We fail to see any practical distinction between the two types of cases. The thrust of the decision in *Cunningham* was the rejection of a defense that was only indicative of a defendant's conduct and exercise of care in the manufacturing process, rather than the required focus on the condition of the product itself. We believe the reasoning of *Cunningham* is especially applicable in the instant cause inasmuch as there did exist, at the time of the Decatur accident, the necessary technology for the design of headshields and the AAR approval procedure for their installation on tank cars. Therefore, a "state of the art" defense based on GATX's compliance with federally mandated tank car design specifications would have been irrelevant.

■■ We also find no merit in GATX's assertion that by the allowance of plaintiff's motion in limine it was precluded from showing that application of a headshield to the tank car in question at the time it was constructed was unfeasible. The plaintiff interjected into the case the issue of feasibility of alternate design through the testimony of her expert witness, Rolf Mowatt-Larssen, who testified, by means of an evidence deposition, that in his opinion it was feasible from an economic, practical and technological viewpoint to install headshields in September 1971, at which time GATX No. 41623 was built. GATX's expert witness, Earl

Phillips, when questioned whether it was feasible, under the same standards, for GATX to have installed headshields on its tank cars in September 1971, and in the years 1972 to 1974, opined that it was not. In addition, Albert Price, GATX chief engineer, testified that in his opinion it was not feasible in 1971 for tank car manufacturers to install headshields. Hence, while the jury did not choose to agree with these views, it is apparent from the record that GATX was not prevented from introducing evidence regarding the feasibility of the installation of headshields prior to July 1974.

● 7, 8 In its final argument on this issue, GATX, citing *Walker v. Trico Manufacturing Co.*, 487 F.2d 595 (7th Cir. 1973), urges that inasmuch as the plaintiff introduced evidence of Federal design specifications, it also should have been permitted to do so as a matter of fundamental fairness. We disagree and believe that GATX's reliance on *Walker* is misplaced. We note from the record that the only evidence of Federal design specifications introduced by the plaintiff was in reference to a DOT regulation issued after the Decatur accident, the admission of which GATX does not cite as error. Plaintiff's expert testified that it was feasible in 1971 to equip a tank car with a headshield as mandated by the Federal regulation which went into effect on August 30, 1974. This evidence, relating to post-occurrence design specification changes, is relevant to the question of feasible design alternatives available to GATX and was properly admitted for that purpose. (*Cunningham v. Yazoo Manufacturing Co.*, 39 Ill. App. 3d 498, 350 N.E.2d 514 (3d Dist. 1976); *Biehler v. White Metal Rolling & Stamping Corp.*, 30 Ill. App. 3d 435, 333 N.E.2d 716 (3d Dist. 1975); *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 326 N.E.2d 74 (1st Dist. 1975); *Sutkowski v. Universal Marion Corp.*, 5 Ill. App. 3d 313, 281 N.E.2d 749 (3d Dist. 1972).) In *Walker*, a plaintiff's expert witness testified that the defendant's competitors in the blowmold machine manufacturing industry placed a safety shield over the machine's activating switch. The defendant's experts countered by testifying that it was not the industry practice to do so. The court, while recognizing that " 'state of the art' has no relevance to the defense of an action sounding in strict products liability," found no error in the admission of defendant's rebuttal evidence, reasoning that the plaintiff, through the testimony of his expert, had opened the door. (487 F.2d 595, 600.) It is obvious that the cases are inapposite; the plaintiff's introduction of post-occurrence standards in the instant cause cannot be said to have "opened the door" so as to have allowed GATX to introduce evidence of its compliance with Federal regulations and standards at the time the tank car in question was manufactured.

GATX next complains that the introduction into evidence of Table A-7, entitled "Loss caused by Head Punctures, Loaded Non-Insulated Steel

Pressure Cars, Class DOT 112A-W, 114A-W," a portion of the report of the RPI-AAR joint project, was improper. GATX urges two grounds as error: (1) that the table was erroneously admitted into evidence as a public document under that exception to the hearsay rule; and (2) that there was no showing by the plaintiff that the list of tank car accidents contained in the table were in any way similar to the Decatur accident.

Prior to trial in this cause, the plaintiff took an evidentiary deposition of its expert witness, Rolf Mowatt-Larssen, Director of the Office of Standards and Procedures of the DOT. During the course of this deposition the witness read, over GATX's objection, a portion of the report prepared in 1971 by the RPI-AAR joint project. As earlier mentioned, the joint project was commissioned by the FRA to study the causes of ruptures and punctures of tank cars that had been involved in railroad accidents, and to find a practical means to reduce a tank car's vulnerability to such occurrences. In the course of its study, the joint project gathered various statistics and data from the DOT, the AAR Bureau of Explosives, and from numerous railroads and tank car companies in the United States and Canada. That portion of the report complained of by GATX, Table A-7, contained statistics concerning head punctures to tank cars in the 112-114 series, the type of tank car involved in the accident in question, in the railroad accident environment between 1965 and 1970.

At trial, Earl Phillips, director of the RPI-AAR joint project, testified on behalf of the plaintiff regarding Table A-7. Phillips related that the accident data and statistics contained therein had been assembled under his supervision and control from authoritative sources and relied upon by the joint project in its study of the problem. GATX objected to the introduction of Table A-7 into evidence on the grounds that the statistics contained therein concerning prior tank car accidents were not similar to the Decatur accident. No objection was made by GATX on the grounds of hearsay. As part of its case, GATX recalled Phillips as its own witness and questioned him in reference to Table A-7, as it had earlier on cross-examination. Subsequent to Phillips' testimony for the plaintiff, Mowatt-Larssen's evidence deposition, with Table A-7 a part thereof, was read into the record. Larssen stated that he was the party responsible for the contract with the RPI-AAR joint project which culminated in the report, containing Table A-7, submitted to the FRA in August 1971. He further stated that the report of the joint project was a part of the public records, and that the statistics and data contained therein were relied upon by his office, the FRA, and himself.

GATX contends that the admission into evidence of Mowatt-Larssen and Phillips' testimony regarding Table A-7 on the basis that it was a public document under that exception to the hearsay rule was error

because insufficient foundation was laid upon which the court could so find. GATX cites pages in Mowatt-Larssen's evidence deposition, which numbered over 300 pages, as substantiation of its objections on these grounds to Mowatt-Larssen's testimony. GATX did not enter this objection at trial when the evidence deposition was read into the record, nor did it raise the objection during Phillips' testimony. Plaintiff responds that there was sufficient foundation laid for the introduction of the evidence complained of. Moreover, plaintiff argues that the pertinent paragraphs in GATX's post-trial motion which related to the allegedly improper evidence did not sufficiently or particularly specify the grounds in support of the points relied upon as required by section 68.1 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 68.1) and Supreme Court Rule 366(b)(2)(iii) (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(iii)).

◼◼ Our review of the record leads us to agree with the plaintiff that this argument has been wavied by GATX. The claims of error by GATX in its post-trial motion are overly general in regard to Mowatt-Larssen's testimony, and only allege insufficient similarity to the accident in question as a ground of error in reference to Phillips' testimony. The failure to particularly specify an error in a post-trial motion operates to waive its reviewability on appeal. (*Reed v. Hoffman*, 48 Ill. App. 3d 815, 363 N.E.2d 140 (5th Dist. 1977); *Taskay v. Foschi Brothers Inc.*, 44 Ill. App. 3d 707, 358 N.E.2d 730 (3d Dist. 1976).) We will not, therefore, consider this ground of error asserted by GATX.

GATX also argues that it was prejudicial error to admit Table A-7 into evidence on the basis that there was an insufficient showing by the plaintiff that past accidents detailed in that document bore any resemblance to the accident in question. As related earlier herein, there was evidence, through the testimony of Earl Phillips, that no more than 26 of the 42 accidents described in Table A-7 occurred during the coupling operation. Thus, GATX asserts that there was no reasonable basis upon which the jury could infer that the prior accidents were caused by defective design of the tank cars, rather than by manufacturing defect or product misuse.

However, plaintiff points out that one of the allegations against GATX in her fourth amended complaint, and repeated in the issues instructions to the jury, was that the tank car in question was so designed and manufactured that when being transported by the railroad the head of the tank had a propensity to become punctured. Plaintiff urges that it was her theory that the tank car was, by its very design, unreasonably dangerous when transported by railroads in the railroad accident environment, including high speed switchyard operations. Plaintiff contends that the statistics contained in Table A-7 related to head punctures of the class of tank cars in question in the railroad accident environment and were,

therefore, relevant in regard to her above-stated allegation against GATX. Moreover, plaintiff argues that the fact that 26 of the 42 accidents recited in Table A-7 involved head punctures during the coupling operation is sufficient to show a similarity to the Decatur accident.

■■ Generally, the rule in relation to the competency of evidence of prior similar occurrences is that the evidence must tend to show the common cause of the accidents to be a dangerous, unsafe thing or condition contributing to the danger of the accident complained of. (*Moore v. Bloomington, Decatur & Champaign R.R. Co.*, 295 Ill. 63, 128 N.E. 721 (1920); *Moore v. Jewel Tea Co.*, 116 Ill. App. 2d 109, 253 N.E.2d 636 (1st Dist. 1969).) It has also been held that the crucial factor in determining the relevancy and admissibility of evidence concerning prior similar occurrences is whether they are reasonably similar to the accident in issue. (*Grant v. Joseph J. Duffy Co.*, 20 Ill. App. 3d 669, 314 N.E.2d 478 (1st Dist. 1974).) We are of the opinion that under either view the evidence complained of was properly admitted, and we clearly could not term its admission by the trial court an abuse of discretion.

■■ GATX's next two claims of error also relate to the testimony of Rolf Mowatt-Larssen, by means of an evidence deposition. GATX first argues that Mowatt-Larssen, after being given several hypothetical facts, was improperly allowed to answer plaintiff's question of whether the Decatur accident was foreseeable by GATX. The court acknowledged, and advised the jury, that the various opinions expressed by Mowatt-Larssen were in reference to a hypothetical accident in Decatur on the same date as the accident in question. The objection raised by GATX at trial, and now claimed as error on appeal, was that foreseeability was not a proper subject for opinion testimony of an expert witness and that it called for an opinion on one of the ultimate issues in the case. Plaintiff asserts that the case at bar involves esoteric problems of the tank car and railroad industries and that, therefore, it cannot be said that any of the ultimate issues including foreseeability, was within the knowledge of persons of ordinary experience. Without reaching this point by the plaintiff, we find no error in the testimony complained of inasmuch as an expert opinion regarding an ultimate issue does not require the trier of fact to accept the expert's opinion and, therefore, it is not an invasion of the province of the jury. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill. 2d 118, 273 N.E.2d 809 (1971); *Clifford-Jacobs Forging Co. v. Industrial Com.*, 19 Ill. 2d 236, 166 N.E.2d 582 (1960).

■■ During the course of his evidence deposition, Mowatt-Larssen was told by the plaintiff to "assume the headshield described in 49 CFR §179.100—23" and was thereupon asked whether it would have been feasible for GATX to have constructed a tank car with such a headshield in 1971. GATX urges that there was insufficient factual foundation laid by

the plaintiff to permit the witness to give a rational answer, and that the question should have been stricken as an invasion of the province of the jury with respect to an issue of ultimate fact. With regard to GATX's second ground as error, we adhere to the view expressed above where we decided this argument adversely to GATX. In addition, we disagree with GATX's claim that there was inadequate foundation to permit the witness to testify. Our review of this testimony satisfies us that there was proper foundation laid for the submission of the question to Mowatt-Larssen, and that it properly instructed him to determine the question of feasibility within the framework of economic effectiveness, practicality and technological possibilities.

Prior to trial, the plaintiff was given leave to amend her complaint, over objection by GATX, by deleting the allegation that GATX's tank car, GATX No. 41623, was "unreasonably dangerous," and substituting therefor an allegation that the tank car was "not reasonably safe." The same term was used in several of the instructions given to the jury at plaintiff's request and over GATX's objection. GATX contends that because strict liability is established only upon a showing that the product in question is unreasonably dangerous, an averment that the product is not reasonably safe is insufficient to state a cause of action in strict liability.

Plaintiff, however, argues that at the time the instant cause was tried, it was felt that the courts of this State had equated "unreasonably dangerous" with "not reasonably safe." After reviewing the authorities cited by the plaintiff, we must agree with her position. Dean Wade has suggested that "the test for imposing strict liability is whether the product was unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression, 'not reasonably safe.' " (J. Wade, *Strict Tort Liability of Manufacturers*, 19 Sw.L.J. 5, 15 (1965).) Our supreme court in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 343, 247 N.E.2d 401, 403 (1969), and *Cunningham v. MacNeal Memorial Hospital*, 47 Ill. 2d 443, 454, 266 N.E.2d 897, 903 (1970), quoted with approval the above statement in Wade's article. In *Rios v. Niagara Machine & Tool Works*, 59 Ill. 2d 79, 83, 319 N.E.2d 232, 235 (1974), the court indicated that the two terms are interchangeable. Courts which have examined the decision in *Rios* have stated that a manufacturer is under a duty to produce a product which is "reasonably safe." *Robinson v. International Harvester Co.*, 44 Ill. App. 3d 439, 444, 358 N.E.2d 317, 321 (5th Dist. 1976), *rev'd on other grounds*, 70 Ill. 2d 47, 374 N.E.2d 458 (1978); *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 985, 326 N.E.2d 74, 84 (1st Dist. 1975).

Subsequent to the trial in this cause, the Illinois Pattern Jury Instructions, Civil (hereinafter IPI) were revised to include the theory of

strict liability in tort. The instructions use the term "unreasonably dangerous" rather than "not reasonably safe." (IPI Civil Nos. 400.01-03, .09 (Supp. 1977).) However, the expression "unreasonably dangerous" is defined in IPI No. 400.06 as meaning "unsafe." While we are of the view that it is the "unreasonably dangerous" condition of a product which leads to liability, we do not believe that it was error to use the term "not reasonably safe." In any event, any error that might have occurred could only be termed harmless inasmuch as we are not convinced the outcome of the trial would have been different or that it resulted in prejudice to GATX.

GATX next complains that the lower court erred in permitting three employees of the N & W to be called by the plaintiff as adverse witnesses under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60). GATX argues that the interests of the plaintiff and these witnesses ceased to be adverse, prior to trial, as to all issues except damages upon N & W's admission of liability to the plaintiff under the Safety Appliance Act counts of her complaint and the subsequent dismissal by the plaintiff of her FELA counts against N & W. It is GATX's contention that at that time N & W ceased to be adverse to the plaintiff and, therefore, the essential requirement for proper examination under section 60 was thereby eliminated. GATX asserts that the fact that the parties remained adverse as to the issue of damages has no bearing on the propriety of plaintiff's examination of N & W's agents on the issue of liability. Plaintiff responds that the facts pertaining to how the accident occurred are inextricably interwoven with the issue of damages, and that since N & W was adverse in regard to this issue, it was also adverse on the issue of how the accident occurred.

Charles Erwin, assistant superintendent of N & W's Decatur Division, testified under section 60 that he visited the switchyard the day after the explosion. His testimony consisted primarily of identifying certain exhibits, mainly photographs, which were subsequently admitted into evidence and are not now challenged by GATX. He also described the post-accident scene and was cross-examined on the question of his adversity by both GATX and Phillips.

Herbert Crowder, a master mechanic for N & W, testified that he arrived at the switchyard approximately 20 minutes after the explosion and related what he had observed with the aid of various photographs which had been admitted into evidence. His testimony also laid the foundation for the admission into evidence of several of the plaintiff's exhibits. He also testified in regard to other railroad cars on track 11 and as to the various repairs made after the accident. He also was cross-examined at length by GATX and Phillips regarding his adversity to the plaintiff.

Donald Gentry was the foreman of the switching crew for the N & W on the day of the accident and was what could be characterized as an occurrence witness. He related the various switching movements which had occurred prior to and during the time at which the tank cars were switched onto track 11. He too was cross-examined extensively by GATX and Phillips regarding his adversity to the plaintiff.

It is obvious from the record that there was a high degree of cooperation between N & W and the plaintiff in regard to these three witnesses. Each of the witnesses met with plaintiff's counsel on at least two occasions prior to their appearances as witnesses. It appears that the purpose of these meetings was to discuss the testimony they expected to give at trial. Although they each admitted that they were told by N & W to cooperate with plaintiff's counsel, none of the witnesses, when questioned by GATX at trial, expressed any particular sympathy with either side's position in the case.

■■ We are of the opinion that any error that might have occurred as a result of plaintiff's examination of these witnesses as adverse witness was not reversible error inasmuch as GATX does not show, nor do we find, that this ruling was in any way prejudicial or detrimental to GATX. The witnesses' testimony served primarily to lay the foundation for several exhibits which were subsequently admitted into evidence. Moreover, it is likely that Gentry, as foreman of the N & W switching crew, would have been called by GATX under section 60 in its case inasmuch as one of GATX's defenses was that N & W's conduct was the sole cause of the accident. In that instance, the plaintiff would have been allowed to cross-examine him anyway, and the same testimony, for GATX, would probably have been elicited.

GATX also argues that the lower court erred in denying its motions, filed immediately prior to the commencement of trial, to dismiss, sever and for continuance on the basis that except as to the issue of damages, there was no real adversary interest between the plaintiff and N & W. As a result of this breakdown in adversity, GATX contends that there existed material collaboration and cooperation between the plaintiff and N & W which, in conjunction with the court's unfavorable rulings on GATX's motions, denied it a fair trial. In support of its argument, GATX cites several alleged improprieties, both before and during trial, by both the plaintiff's and N&W's counsel. We have already ruled unfavorably to GATX regarding one such claim, namely its complaint that the plaintiff was improperly allowed to examine three N & W employees as adverse witnesses. Having carefully reviewed the record before us, we also find this broader charge by GATX to be without merit.

As stated earlier herein, trial commenced in this cause with N & W contesting only the issue of the amount of damages due the plaintiff. Prior

to trial, GATX and Phillips submitted interrogatories to both the plaintiff and N & W inquiring into the details of any settlement, covenant, loan receipt agreement or understanding as to compromise. Both N & W and the plaintiff denied any material understanding with the exception of their sharing of certain expenses incurred during discovery. After N & W's admission of liability under the Safety Appliance Act counts of plaintiff's complaint and plaintiff's dismissal of its FELA counts against N & W, GATX moved for dismissal, severance and continuance.

GATX asserts that it filed these motions with a view towards determining the nature and circumstances of an alleged understanding between the plaintiff and N & W; however, no such basis was advanced to the trial court. Nevertheless, we note that Phillips then filed a written motion for an order of full disclosure of any alleged understanding between N & W and the plaintiff. This motion was argued and allowed. During the argument, there was a colloquy between counsel for all of the parties regarding any pretrial agreements or understandings between the plaintiff and N & W. At one point during this argument plaintiff's counsel stated that apparently counsel for GATX and Phillips had "asked the wrong questions" in their interrogatories. However, in spite of this remark by plaintiff's counsel, the meaning of which we cannot be certain, both counsel for the plaintiff and N & W repeatedly denied that any understanding or agreement had been reached prior to the date on which N & W confessed liability under the Safety Appliance Act counts of plaintiff's complaint. This position is maintained by the plaintiff now on appeal and we fail to see how any further inquiry or exploration into the matter by GATX would be fruitful. Moreover, we note that in its answer to the plaintiff's complaint, N & W stated that the puncture of the tank "might have constituted a violation of that statute" in reference to the Safety Appliance Act counts. Plaintiff claims that this statement led her to believe that N & W might admit liability under these counts, but that she could not be sure until N & W did so immediately prior to the commencement of trial. Plaintiff further asserts that she was totally prepared to pursue her case against N & W, having served several subpoenas and notice to N & W to produce certain persons.

In further response to GATX's allegation that she improperly cooperated with N & W, plaintiff points out that with respect to GATX and Phillips, her goals and that of N & W were the same. Hence, plaintiff argues that there was an inevitable breakdown of adversity between herself and N & W which would have resulted even if N & W had not admitted liability. We note from the record that with its answer to plaintiff's complaint, N & W filed counterclaims, sounding in strict liability in tort, against GATX and Phillips for indemnity. However, because of a prior indemnity action filed by Phillips in the Circuit Court

of Macon County against N & W, the counterclaims were severed, consolidated, and transferred to that court where they are still pending. We agree with the plaintiff that the posture of this case naturally led to some degree of cooperation between herself and N & W, a matter which was thoroughly explored by GATX in its cross-examination of every N & W employee.

■■ When trial commenced, counsel for N & W told the jury that he believed that the plaintiff was entitled to reasonable compensation from the railroad, as well as from GATX and Phillips, for the fatal injuries sustained by her husband. He further argued, over objection, that the real cause of the plaintiff's damages was the conduct of GATX. However, we note that counsel for GATX in his opening statement to the jury, stressed that the cause of the Decatur occurrence was the high-speed coupling maneuver by N & W and its gross mishandling of the tank cars in the switchyard. This assertion was consistent with GATX's defense that the sole cause of the accident in question was the negligence of N & W. We are of the opinion that GATX has not sufficiently shown that the cooperation between N & W and the plaintiff was so improper as to deny it a fair trial. We further find no abuse of discretion in the lower court's denial of GATX's motions to dismiss, sever and for continuance.

GATX's final contention, raised by a motion filed in this court which we have taken with the case, relates to the validity of the loan receipt agreement executed by N & W and the plaintiff subsequent to the entry of judgment in this cause and during the period in which the defendants could file their notice of appeal. By the terms of the agreement, N & W has advanced $700,000 to the plaintiff as a loan which the plaintiff has agreed to repay out of any portion of the judgment she may eventually collect from GATX. She has further agreed "to use and pursue any and all legal and reasonable means" to enforce her judgment against GATX.

■■ As a continuation of its argument regarding the allegedly material and prejudicial cooperation between N & W and the plaintiff in this cause, GATX asserts that the entire undertaking leading up to the execution of the loan agreement was one of concealment. While we are mindful that total or partial concealment of a loan agreement from the court and affected parties will result in a sham proceedings and should not be condoned (*Gatto v. Walgreen Drug Co.*, 61 Ill. 2d 513, 337 N.E.2d 23 (1975); *Hook v. Heim*, 54 Ill. App. 3d 368, 369 N.E.2d 563 (5th Dist. 1977)), we cannot agree with GATX that such a situation exists in the instant cause. Plaintiff maintains that the loan agreement was first broached after judgment had been entered and only a few days before it was actually executed. Except for its allegations of concealment, we can find no basis to support GATX's claim that the agreement was part of a secret understanding between N & W and the plaintiff.

GATX further contends, relying on this court's decision in *Kerns v.*

*Engelke,* 54 Ill. App. 3d 323, 369 N.E.2d 1284 (5th Dist. 1977), *appeal allowed,* ___ Ill. 2d ___, that the loan agreement is invalid and must be considered instead to be a partial satisfaction of judgment. After analyzing two supreme court decisions concerning similar loan agreements, *Reese v. Chicago, Burlington & Quincy R.R. Co.,* 55 Ill. 2d 356, 303 N.E.2d 382 (1973), and *Harris v. Algonquin Ready Mix, Inc.,* 59 Ill. 2d 445, 322 N.E.2d 58 (1974), we held in *Kerns* that loan agreements of this type are valid only where executed before trial, or in situations where the contracting defendant might otherwise be entitled to indemnification. While noting that a loan agreement could be valid even if executed after trial and judgment, we found the agreement to be void because the contracting defendants had not asserted a claim for indemnification from the other defendants (54 Ill. App. 3d 323, 340, 369 N.E.2d 1284, 1297). GATX submits that the only court capable of determining the legal effect of a claim for indemnification is the court presiding over the claim itself. Thus, in those instances where the claim for indemnification is brought in a separate proceeding, or where the indemnification action is severed from the primary litigation, any loan agreement executed after entry of judgment must be held to be a total or partial satisfaction of judgment.

In response to GATX's argument, the plaintiff asserts that she is merely seeking execution of judgment against one joint tortfeasor which she has the right to do. She argues that the fact that she borrowed money from N & W should in no way affect her right to seek total recovery from GATX. The plaintiff submits that this case is one where the contracting defendant "might otherwise be entitled to indemnification," and contends that N & W has a valid indemnification suit pending against GATX.

■■ Hence, it is plaintiff's view that N & W is "otherwise entitled to indemnification" on the basis of the pending indemnification action in the Circuit Court of Macon County, notwithstanding the fact that the action was originally brought in that county by Phillips against N & W. One commentator has suggested that in determining whether a pending claim for indemnification is sufficient to support a loan agreement, a court should implement a good faith test which would include consideration of the amount guaranteed in relation to the plaintiff's claim, the relative blameworthiness of the various defendants and a review of the settlement arrangement in light of the likelihood of the plaintiff prevailing against each defendant. (R. Michael, *"Mary Carter" Agreements in Illinois,* 64 Ill. B. J. 514, 527-28 (1976).) This proposal obviously contemplates a situation where the liability of any defendant has yet to be determined. While we do not depart from the view we expressed in *Kerns* that a loan agreement entered into after trial and judgment can be valid, we do not believe, in light of the facts of this case that the loan agreement between N & W and the plaintiff can be so termed.

■■ In a case where the primary claim and the indemnification action are

heard together, or in those instances where the right to indemnification is contractual, a court may construe the effect of any loan agreement in light of the outcome of the proceedings. Neither situation is present in the instant cause, and to uphold the validity of the complained of loan agreement could have the effect of permitting indemnification where it is not proper, or at least where the right to indemnification is not entirely certain. GATX contends that the unsalutory effect of such an arrangement on the adversary nature of the proceedings is illustrated by the facts of this case. After admitting liability to the plaintiff, N & W's chances of escaping an execution of judgment hinged either on successful prosecution of its indemnity claim against GATX or the execution of a loan agreement with the plaintiff. Inasmuch as the indemnity claim was still pending in another county at the time of trial, both the success of the indemnity claim and the effectiveness of the loan agreement from N & W's point of view depended upon a finding of liability against GATX.

We conclude that on public policy grounds and in order to properly protect the interests of GATX, as a noncontracting defendant, we must declare that the money advanced to the plaintiff by N & W under the loan agreement to be a partial satisfaction of her joint judgment against GATX and N & W. In this way, if N & W prevails in its indemnity action, under an active-passive negligence theory, it will be entitled to recover the judgment from GATX. However, in the event that N & W does not prevail, the rights of GATX will not have been jeopardized. We therefore hold that the plaintiff is not obligated to repay the sum advanced by N & W and order that the amount of the loan ($700,000) be set off against the verdict awarded her.

For the foregoing reasons the judgment of the Circuit Court of Madison County is affirmed and the motion by GATX to limit execution and for credit and reduction upon judgment is allowed.

Affirmed; motion to limit execution and for credit and reduction upon judgment allowed.

EBERSPACHER, P. J., concurs.

Mr. JUSTICE JONES, dissenting:

Plaintiff's action against defendant GATX sounds in strict liability for a defective product design. Since I believe the majority applied an erroneous test for determining whether the railway tank car in question was unreasonably dangerous because of its defective design, and since I believe the majority erroneously sanctioned the trial court's refusal to permit GATX to present to the jury in its defense the "state of the art" and its compliance with Federal standards and regulations, I respectfully dissent.

The confusion inherent in cases involving a determination of when a product is unreasonably dangerous because of defective design is embodied in the majority opinion. They relate that "GATX seeks to distinguish the rejection in *Cunningham* of 'state of the art' as a defense in strict products liability cases, arguing that the court in *Cunningham* was not confronted with a case involving product design, but rather a contaminated product." To this argument the majority remarked, "*We fail to see any practical distinction between the two types of cases.*" (Emphasis added.) Thus, the majority sees no distinction between this case and the ordinary products liability case involving faulty manufacture. I believe the distinction is real and calls for a departure from the usual approach to the determination of liability.

Although my research has not disclosed any Illinois cases that have expressly considered the question, there is a growing awareness among legal commentators and courts that cases asserting strict liability for a product rendered unreasonably dangerous because of defective design cannot be handled in the same manner as the usual defectively manufactured product case.

The facts attending the case against GATX which we have under consideration present the "unreasonably dangerous because of defective design" issue squarely and squarely we should meet it. The result reached by the majority has imposed absolute liability upon the manufacturer, or, at best, has left the question of liability to the whim of the jury. The jury was given no standards whatsoever as a guide for their determination of the crucial issue in the case against GATX—was the tank car in question unreasonably dangerous because of a *defective design?*

The most basic distinction in products liability cases is that between those cases involving manufacturing flaws and those cases involving generically dangerous products. Manufacturing flaws are imperfections that are bound to appear in some products as a result of the fallibility of the manufacturing process; some products simply do not measure up to the intended design. On the other hand, generically dangerous products are dangerous because of the manner in which they are designed or marketed. Such products conform to the intended design.

Generically dangerous products may be subdivided into products that are unusually dangerous because of the manufacturer's design errors and products that are dangerous because of a conscious choice in the product's design.

A designer of products may inadvertently fail to appreciate the various elements of design or to incorporate in his design the generally accepted techniques applicable to the particular process.

In contrast with products unreasonably dangerous because of inadvertent design errors are products that are dangerous as a result of conscious design choices. Such products are generically dangerous and

the danger may bear a direct relation to the function of the product and their makers are fully aware that they are designing and creating a dangerous product. With this category of unreasonably dangerous products courts have encountered considerable difficulty in determining liability and it is with this category that we are here concerned.

The railway car in question was the result of a conscious design choice and was constructed without flaw in the manufacturing process. That it was dangerous must now go without question. Likewise, it appears there is no question but that the accident and injury which occurred were foreseeable in the sense that it was objectively reasonable to expect. *Winnett v. Winnett*, 57 Ill. 2d 7, 310 N.E.2d 1.

But to say that the railway car in question was dangerous does not conclude the question of defendant's liability. As our supreme court said in *Rios v. Niagara Machine & Tool Works*, 59 Ill. 2d 79, 83, 319 N.E.2d 232, 235: "* * * [T]o establish liability in strict tort it is not sufficient that the plaintiff prove the product was dangerous; he must prove that it was unreasonably dangerous, or in other words not reasonably safe."

Section 402A of the Restatement (Second) of the Law of Torts (1965) recognizes that the law must make some allowance for products that are generically dangerous in order that liability for injuries from the use of such products not be absolute. Comment *k* of section 402A states:

> "*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. * * * The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

In line with this comment from the Restatement, Illinois courts, along with the courts of every other jurisdiction, have consistently refused to adopt a rule of absolute liability for injury from defective products. For instance, there is no liability where the danger is open and readily apparent to all (*Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 343 N.E.2d 465); where the injury is not foreseeable in the sense that it is not objectively reasonable to expect (*Winnett v. Winnett*); where the plaintiff has assumed the risk (*Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 261 N.E.2d 305); or where the product is misused (*Lewis v. Stran-Steel Corp.*, 6 Ill. App. 3d 142, 285 N.E.2d 631, *rev'd on other grounds*, 57 Ill. 2d 94).

Given that much social utility and benefit are derived from the use of

generically dangerous products, our society could not exist without them, and that absolute liability should not be imposed upon the manufacturers for injuries inflicted by such products, what are the standards by which liability is to be imposed?

Criticism of the practice of submitting for jury determination under the "manufacturing defect" format the question whether a product is unreasonably dangerous because of defective design is readily found together with suggestions for a rational approach to a proper submission of the issues.

Dean Page Keeton, an acknowledged authority in products liability law, states in *Manufacturers Liability: The Meaning of "Defect" in the Manufacture and Design of Products*, 20 Syracuse L. Rev. 559 (1969), that there is great confusion and uncertainty as to the extent of strict liability for defective design. He suggests that differences between design cases and manufacturing cases are found in terms of the policy of allocating risks. A miscarriage in the manufacturing process is a proper risk to be allocated to the maker but it is not at all clear that this concept is true in all design cases. He states also that nothing is so safe that it cannot be made safer, and extremely close questions are presented, especially when the danger involved in the design is open and obvious. Dean Keeton suggests that the negligent design inquiry is one which requires proof to support the following findings:

> "(1) an appreciable danger from some condition, ingredient, or component of the product in fact existed; (2) actual or implied knowledge that harm could result from a condition or an ingredient of the product was present at the time of sale; (3) that the maker realized or should have realized in the exercise of ordinary care the dangers involved in the product's use; and (4) that an ordinary man would have concluded that the magnitude of the discoverable danger outweighed the benefits of the product, at least in the absence of more satisfactory instructions or information."

Professor Henderson, in *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Columbia L. Rev. 1531, 1558 (1973), warns:

> "Assuming the validity of the hypothesis that adjudication is unsuited to answering the question of 'How much design safety is enough?,' it follows that a broad scale judicial commitment to the independent review of conscious design choices would bring with it a very real threat to the integrity of the judicial process. Confronted with the hopeless difficulties of trying to redesign products via adjudication, and presumably unable to resist the social pressures generally favoring injured plaintiffs, courts would

inevitably resort to some form of judicial coin-flipping, *i.e.*, they would begin to determine defendant's liability on some arbitrary basis rather than on the purported basis of the reasonableness of the product designs brought before them. Efforts to establish meaningful design standards would be abandoned in favor of allowing juries to determine defendants' liability upon no more substantial grounds than their own untutored 'good judgment,' or whim. The shift in the basis of manufacturers' liability would be disguised, consciously or otherwise, by heavy reliance upon the unsupported opinions of experts relating to the ultimate issue of the reasonableness of defendants' conscious design choices. The absence of any viable product safety standards with which to decide the cases, however, would be obvious even to the casual observer. In effect, the adjudicative process would largely become a sham. Although such tactics might render these cases manageable in the short run, they would do so at the cost of a serious erosion of confidence in the courts by those litigants who would correctly come to realize that they have been denied effective access to the adjudicative process by such subterfuge."

Dean Wade, in *On the Nature of Strict Tort Liability for Products*, 44 Miss. L. J. 825 (1973), states that in design cases policy issues become very important and relevant factors must be collected and carefully weighed. He suggests a test which looks to the manufacturer's "reasonably prudent" conduct, and which assumes that the manufacturer's knowledge of the condition of the product existed. The test should ask whether under these circumstances it was unreasonable for such manufacturer to place the product on the market. The test is similar to that in an ordinary negligence case except that the element of scienter is presumed. The issue becomes, Dean Wade states, "whether the magnitude of the risk created by the dangerous condition of the product was outweighed by the social utility attained by putting it out in this [dangerous] fashion."

Dean Prosser suggests that the consideration of a defective design rests primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence which involves a duty to use reasonable care to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable. Prosser on Torts §96.

Michael Hoenig, of the New York Bar, in *Product Designs and Strict Tort Liability: Is there a Better Approach?* 8 Sw. U. L. Rev. 109, 120 (1976), states:

"Design cases by their nature present the courts with difficult problems. To evaluate the design of an automobile, for example, the court must not only consider engineering factors but also must

make value judgments about the extent to which the design may subordinate safety to considerations of price, style, and convenience. In design cases much more than the product is impugned. The designer's conduct is impugned as well, for the allegations necessarily question the manufacturer's balancing of the harm against the utility of the product in the light of industry standards."

Examination of the full texts of the above-cited commentaries, and consideration of the analyses of relevant cases, leads to the inescapable conclusion that there is a means and manner for rationally determining, by the existing adjudicative process, when a product, dangerous as a result of a conscious design choice, is unreasonably dangerous and its maker subjected to strict products liability for resultant injuries.

In the case under consideration the trial court gave the jury Plaintiff's Instruction No. 26A, a non-IPI instruction, over defendant's strenuous objection:

"The manufacturer of a product is liable for damages proximately resulting from its reasonably foreseeable use, if, at the time it left its control, there existed in the product a condition which rendered it not reasonably safe for such use. It is not a defense that the condition could not have been discovered by the manufacturer, or that all possible care used in the manufacture of the product, or that the manufacturer adhered to all rules, regulations, specifications or state of the manufacturing art existing at the time the product was manufactured or left its control."

In the case of an unreasonably dangerous product which is the result of a manufacturing defect or an inadvertent design error, this instruction would be proper. The first sentence of the instruction is apparently a derivative of IPI Civil No. 400.06 (Supp. 1977), which provides:

"When I use the expression 'unreasonably dangerous' in these instructions, I mean unsafe when put to a use that is reasonably foreseeable considering the nature and function of the [product]."

It can be readily seen that the effect of the foregoing instruction was to direct a verdict of absolute liability. No matter that the product was the ultimate in design, or that its design was compelled by legislative or administrative regulation, or that no other design was for any reason unavailable, or that it was the same design used by other manufacturers. There was no means or manner whatsoever in which GATX could show the design was not defective and that although the tank car was dangerous it was not unreasonably dangerous.

Other jurisdictions have considered the problem and developed workable formulas for submitting the issues in defective design cases for jury consideration.

In *Barker v. Lull Engineering Co.* (1978), 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 223, the Supreme Court of California considered an assertion by plaintiff that a highlift loader was unreasonably dangerous because of defective design. Plaintiff was the operator of the loader when it became unstable as an elevated load was being handled while the loader was on uneven ground; the loader tipped over and when plaintiff jumped from the cab he was struck and injured by a piece of lumber which had fallen from the load. The loader was designed so that its load could be kept level even when the loader was being operated on uneven terrain.

The court in *Barker* examined the basis of liability for defective products and concentrated in particular upon the meaning of defect in the context of a charge of improper design. They noted the distinctive approach required in a products liability case involving defective design:

> "[T]he concept of defect raises considerably more difficulties in the design defect context than it does in the manufacturing or production defect context." (20 Cal. 3d 413, 429, 573 P.2d 443, 453-54, 143 Cal. Rptr. 223, 235.)

After a review of California cases the court found a two-pronged definition of design defect that California courts had followed without having expressly articulated them as such. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design, if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. Commenting on the two-pronged test thus articulated the court stated:

> "[W]e believe that the test for defective design set out above is appropriate in light of the rationale and limits of the strict liability doctrine, for it subjects a manufacturer to liability whenever there is something 'wrong' with its product's design—either because the product fails to meet ordinary consumer expectations as to safety or because, on balance, the design is not as safe as it should be— while stopping short of making the manufacturer an insurer for all injuries which may result from the use of its product. This test, moreover, explicitly focuses the trier of fact's attention on the adequacy of the product itself, rather than on the manufacturer's conduct, and places the burden on the manufacturer, rather than the plaintiff, to establish that because of the complexity of, and

tradeoffs implicit in, the design process, an injury-producing product should nevertheless not be found defective.

* * *

* * * [P]ast design defect decisions demonstrate that, as a practical matter, in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not." 20 Cal. 3d 413, 432, 573 P.2d 443, 456, 143 Cal. Rptr. 223, 238.

The *Barker* court took care to cast the burden of proof in design cases on the manufacturer in the following manner:

"Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective." 20 Cal. 3d 413, 431, 573 P.2d 443, 455, 143 Cal. Rptr. 223, 237.

Other jurisdictions have adopted similar, though not identical, tests for use in determining when a product is unreasonably dangerous because of defective design. See, *e.g., Henderson v. Ford Motor Co.* (Tex. 1974), 519 S.W.2d 87; *Welch v. Outboard Marine Corp.* (5th Cir. 1973), 481 F.2d 252.

In *Product Liability and the Meaning of Defect,* 5 St. Mary's L. J. 30 (1973), Dean Keeton proposes an intelligible and workable test for determining when a product is unreasonably dangerous because of defective design.

"A product is defective if it is unreasonably dangerous as marketed. It is unreasonably dangerous if a reasonable person would conclude that the magnitude of the scientifically perceivable danger *as it is proved to be at the time of trial* outweighed the benefits of the way the product was so designed and marketed. Under the heading of benefits one would include anything that gives utility of some kind to the product; one would also include the infeasibility and additional cost of making a safer product. As the Court of Appeals for the Fifth Circuit has said, '[D]emanding that the defect render the product unreasonably dangerous reflects a realization that many products have both utility and danger.'"

Thus, Dean Keeton sees the test as an equation: If a reasonable person would conclude that the danger in fact of the product designed outweighs

the utility of the product, then it is defectively designed. Under this equation a product is not unreasonably dangerous because of its design if its social utility outweighs its danger; or, it is unreasonably dangerous because of its design if its danger outweighs its social utility.

This test, expressed in equation form, is easily framed into instructions for the jury and presents matters for resolution by them that are no more complicated than they would encounter in an ordinary negligence action. Once the plaintiff establishes a *prima facie* case of dangerous design the burden of proof that the benefits of the challenged design outweigh the risk of danger in such design should be on the defendant.

By "utility" is meant the social benefit derived from use of the product; whether there is a more feasible way of designing the product so as to make it safer; and are there alternative products that would give the same benefits without the danger.

In the suggested approach the plaintiff would attempt to show such matters as that others used a safety device which was missing or that an inexpensive part could have been used to prevent the accident. The defendant could then introduce such matters as cost, function, utility and other matters that served to narrow design choices. "State of the art" would be proper evidence as would any standards contained in legislation, or administrative regulations, and industry standards.

As expressed above, I believe evidence of the "state of the art" should be admissible in a defective design action. Whether or not it constitutes a defense is a matter for resolution by the jury. In this regard I disagree with the assertion by the majority that the *Cunningham* case is authority for the proposition that "state of the art" is never to be utilized as a defense in a products liability case. As I have discussed, a distinction must be made in the type of products liability that is being asserted, and that distinction needs no further discussion here. Suffice it to say that *Cunningham* was concerned with a defect that occurred during *production*, it did not involve an assertion of unreasonable danger because of a design defect. It accordingly is not authority for the statement by the majority that "state of the art" is never a defense.

The case of *Gelsumino v. E. W. Bliss Co.*, 10 Ill. App. 3d 604, 295 N.E.2d 110, was a products liability case in which plaintiff alleged improper design. The core question in the appeal was whether the defendant should have been permitted to use evidence of the "state of the art." In sole reliance upon the statement in *Cunningham* the court held that the "state of the art" was of no consequence in determining the liability of defendant. In the posture of the case thus cast, it permitted absolute liability of the defendant to be fixed upon the defendant at the whim of the jury.

The *Gelsumino* case was discussed and criticized, and the statement in

*Cunningham* regarding the "state of the art" defense evaluated, in an article appearing in 41 Tenn. L. Rev. 357 (1974), *Products Liability—Strict Liability—Elimination of the "State of the Art" Defense.* The article concluded that:

> "Therefore, the *Cunningham* rationale is appropriate where there is a problem in the fabrication of the product but the design is proper. But it should not have been applied where there is an allegation of improper design which has made the product unreasonably dangerous." 41 Tenn. L. Rev. 357, 362.

For the foregoing reasons I would reverse and remand this case for a new trial with directions that the question whether the tank car was unreasonably dangerous because of defective design be submitted to the jury by an instruction framed in terms of the equation formula suggested by Dean Keeton, and that evidence be received as it may have a bearing upon the facets of that formula.